State of Missouri, Upon the Information of Roy McKittrick, Attorney General of the State of Missouri, Informant, v. W. D. Koon and Mrs. W. D. Koon.—No. 39040.—201 S. W. (2d) 446.

Court en Banc, April 21, 1947.

*J. E. Taylor,* Attorney General, and *Arthur M. O'Keefe,* Assistant Attorney General, for informant; *Allen McReynolds* of counsel.

286

288

*Frank C. Mann, Gene Frost* and *C. A. Fuller* for respondent; *Mann & Mann* of counsel.

290

█ CONKLING, J.—This is an original proceeding by Information for contempt filed on March 7, 1944 against respondents by the Attorney General as Informant. We appointed Honorable James H. Linton, of the Lafayette County Bar, as Special Commissioner to hear evidence and to report findings of fact and conclusions of law. He filed his report, found W. D. Koon guilty of contempt █ of this Court, and found for Mrs. W. D. Koon. The Informant and each respondent have filed exceptions.

The contempt Information arose from the following facts: On November 17, 1941 Informant filed an Information here in quo warranto against the instant respondents and one Wilson Bradley (cause 37906) charging that since 1934 they had held themselves out to be a corporation styled, Barry County Burial Association, of Cassville, Barry County, Missouri (hereinafter called Missouri Association), and that respondents, under that name, and contrary to law (See, State ex inf. Williamson v. Black, 347 Mo. 19, 145 S. W. (2d) 406) were usurping the franchise of writing and selling policies of funeral and burial insurance in Missouri. In 1940 after our decision in the Black case, supra, W. D. Koon knew Missouri Association could not continue to do business in Missouri, but he nevertheless continued to operate as theretofore. Upon the filing of the quo warranto Information we issued an order to show cause why judgment of ouster should not be issued. Mrs. W. D. Koon claimed to be president, Wilson Bradley claimed to be Vice-President and W. D. Koon claimed to be Secretary-Treasurer of Missouri Association. On December 15, 1941, Koon, and his counsel, and counsel representing Mrs. Koon and Bradley in informal conference admitted to Informant the truth of the allegations of the Information, stated they had on hand or coming in as an assessment about $55,000 of monies being paid by policyholders, agreed they would confess judgment of ouster if given 90 days to satisfy claims and disburse said monies, and agreed that they would thereafter cease and desist selling burial insurance in Missouri. Respondents then requested that Missouri Association be made an additional party respondent to said cause so that if costs were assessed same could be paid from said monies on hand. Such amended Information was accordingly filed.

On January 5, 1942, a written stipulation, which was later filed here in that cause, was prepared and executed by Informant and counsel for respondents wherein it was agreed that in that cause we should enter against respondents a judgment and order of ouster effective as of April 5, 1942, and in such judgment restrain respondents from soliciting or accepting any new burial insurance contracts

after January 5, 1942. The parties further agreed therein that respondents should hold the monies in trust to perform outstanding contracts and that costs should be paid therefrom. Koon understood that the stipulation he authorized contemplated the entry of a judgment forbidding him to further solicit, accept or write funeral and burial insurance contracts in Missouri. On January 12, 1942 respondents filed their return to the amended Information, admitted the truth of its averments and confessed a judgment of ouster. On said date we entered judgment in that cause, by which judgment all respondents were ousted from purporting and holding themselves out to be a corporation, were ousted from further usurping the franchise and privilege of writing and selling funeral and burial insurance in Missouri, were restrained from the solicitation and acceptance of any new burial insurance contracts on and after January 5, 1942, and the judgment further provided that the monies be held in trust for the purposes agreed upon, and provided payment of costs.

It appears from the pleadings, transcript and exhibits, and the Special Commissioner found, that on December 1, 1941, unknown to Informant and to this Court the respondents and their daughter incorporated the Barry County Burial Association, Inc., of Eureka Springs, Arkansas (hereinafter called Arkansas Association), under the laws of the State of Arkansas, for the purpose of continuing, by such instrumentality, the writing of funeral and burial insurance in Missouri and other states. Mrs. W. D. Koon was President and W. D. Koon was Secretary-Treasurer of Arkansas Association. They owned a majority of the stock, were at all times in the actual control and supervision of its property, business, funds and affairs. Shortly after December 1, 1941 and long prior to the liquidation of Missouri Association respondents transferred and delivered to Arkansas Association all the records (including a complete list of policyholders) of Missouri Association. On February 16, 1942, Koon caused ▮▮▮ letters to be written by Arkansas Association, and signed by him, to about 85,000 residents of Missouri who held funeral and burial contracts of Missouri Association advising them that under the order of the Missouri Supreme Court Missouri Association could not maintain offices in Missouri, but "we have formed a corporation under the laws of Arkansas known as the Barry County Burial Association, Inc., of Eureka Springs, Arkansas". In those letters Koon sent each a new funeral and burial policy issued by Arkansas Association, urged its acceptance by each such Missouri policyholder and requested Missouri policyholders to mail their assessments to Eureka Springs. The policy issued by Arkansas Association was in substance identical with the policy theretofore issued by Missouri Association. Such policies sent to and retained by Missouri policyholders bore the same number as the former policies issued by Missouri Association and showed the same age for the policyholder as was shown by the

former policy. About 75,000 Missouri residents retained such policies and became members of Arkansas Association.

Both before and after January 12, 1942 the same undertaker in each Missouri community where there were policyholders was placed on the "designated" list of both the Missouri and the Arkansas Association. A "designated" undertaker was one whom the Association required to be called to furnish appropriate merchandise and funeral services when a policy matured and became due. Such undertaker participated on a contract basis. Association thus reserved the right to limit and to name the designated person to be called on to carry out Association's contract in Missouri. Upon the filing of the ouster suit here certain Missouri newspaper advertisements by some of such "designated" Missouri undertakers were immediately critical and derogatory of the ouster suit and urged certain classes of people to "arise and fight *this sinister group* that seeks to destroy their sacred rights and privileges". The policyholder usually involved was humble and the amounts involved in policy premiums and assessments in each instance were not large. Newspaper advertisements in Missouri by some "designated" undertakers advised Missouri policyholders that they would be sent policies in Arkansas Association, and that "the only difference in the plan of operation is that all business will be transacted in Eureka Springs, instead of Cassville".

Missouri undertakers formerly "designated" by Missouri Association were continued as "designated" by Arkansas Association. Arkansas Association distributed to its Missouri policyholders a list of Missouri "designated" undertakers. Certain "designated" undertakers in Missouri kept printed applications of Arkansas Association for policies. Such undertakers and their employees solicited contracts, made out applications, kept records and card indexes of policyholders of Arkansas Association and of their payments, made collection of assessments due Arkansas Association on policies, issued various receipts therefor, regularly remitted collected assessments in quite sizable amounts to Arkansas Association, sometimes drove to Eureka Springs to deliver such funds in person, delivered policies to new policyholders and performed other acts of agency for Arkansas Association. These and other acts of agency were in fact performed for respondents, as will be hereinafter noted. Other payments were forwarded direct to Arkansas Association by mail from the policyholder.

When policyholders failed to use the "designated" undertaker for appropriate merchandise and funeral services when same became due under policies, Arkansas Association usually refused to pay the bill for funeral services. Certain "designated" undertakers in Missouri provided display advertisements in Missouri newspapers for Arkansas Association, stating therein that Arkansas Association was

*given the privilege* of issuing policies to the Missouri policyholders. Letters signed by Koon in answer to inquiry from prospective Missouri policyholders stated, "For many years before the Supreme Court of Missouri held that Burial Associations could no longer operate except as insurance companies, we were located at Cassville, Missouri". Advertisements in Missouri newspapers soliciting contracts for Arkansas Association contained printed applications therein, and warned of deadline dates for payment of certain assessments. The Koon Funeral Home in Cassville, Missouri, owned solely by respondents, was on the "designated" list, was quite active in advertising Arkansas Association, and applications for policies in Arkansas Association were solicited and accepted in that funeral home. Koon continued to live in Cassville, Missouri though his business was nominally a few miles south at Eureka Springs, Arkansas. Mrs. W. D. Koon, one of the respondents herein, personally solicited and accepted a new funeral and burial contract in Missouri. When a policyholder died in Missouri, if a "designated" undertaker furnished the appropriate merchandise and funeral service, such "designated" undertaker sent in the policy and made claim to Arkansas Association upon a blank furnished by Arkansas Association for that purpose. The "designated" undertaker then received from Arkansas Association 90% of the face value of the policy, and Arkansas Association credited itself with the payment of the full face value of the policy.

From February, 1943 to June, 1945 Arkansas Association advertised extensively by radio broadcasts over station KWTO in Springfield, Missouri, in which it claimed it "was organized 9 years ago", praised the service it claimed to give, reviewed at length the claimed benefits and low costs, advised when certain assessments were due and urged listeners to purchase contracts of funeral and burial insurance. Contracts for such radio time were executed by W. D. Koon.

At and before the entry of our judgment of ouster on January 12, 1942 W. D. Koon was advised by his counsel and knew and understood that he could not solicit or accept, directly or indirectly, any contracts of funeral or burial insurance in Missouri. Koon further testified that he was told by his counsel, "that I was not to write any more members"; and, "that I could liquidate if I would quit in Missouri"; and, "that I would go ahead and liquidate the old Barry County Burial Association, and I would have to quit writing, or quit having any agents in Missouri." Koon further testified: "I knew the (Missouri Supreme) Court had ordered me to cease to do business when this (Missouri) Association was liquidated". Respondents did not advise either Informant or this Court that they had theretofore incorporated in Arkansas and intended to continue to do in Missouri the very thing the judgment of this Court forbade them to do. Before January 12, 1941, respondents did business in Missouri under the name of "Barry County Burial Association of Cassville, Barry County,

Missouri'', and in Arkansas incorporated as the ''Barry County Burial Association, Inc.'' There is no Barry County in Arkansas. The purpose of the similarity in names is obvious, and was admitted by Koon.

Respondents transferred to Arkansas Association $800.00 in monies which had been impressed with a trust for the purpose of liquidating Missouri Association, and instead of returning said funds to the individuals who deposited the same, wrote new policies in Arkansas Association and sent them to the Missouri residents in lieu of returning the money. At the time of the transfer of the $800.00, respondents transferred the membership records, the files and mailing list of Missouri Association for the purpose of enabling Arkansas Association to take over and conduct the business of Missouri Association. If at the time of the execution of the stipulation and entry of the judgment here, Informant had known respondents had incorporated in Arkansas and intended to continue writing policies of funeral and burial insurance in Missouri in violation of our judgment, Informant would not have executed the stipulation, and we would not have entered judgment in that form and without penalty. After our judgment of ouster was entered respondents intentionally continued to solicit and accept applications for and to write policies of funeral and burial insurance in Missouri contrary to the Missouri insurance laws and contrary to the decree of this Court. We must conclude that respondents incorporated, controlled and operated Arkansas Association as a subterfuge and device for the purpose of and by means of which they personally continued to solicit, accept, write and sell funeral and burial insurance in Missouri contrary to the Missouri insurance code.

Respondents' return and answer denies that they pretended they would cease writing burial insurance in Missouri except under the charter of Missouri Association; admits they incorporated Arkansas Association unknown to Informant and to this Court ''for the purpose of carrying on and transacting the business of writing, selling, soliciting and accepting funeral and burial insurance in the State of Arkansas and of soliciting funeral and burial insurance in other states'', and asserts that Arkansas Association ''has solicited applications for funeral and burial insurance in the State of Missouri . . . as a foreign corporation'', upon the advice of counsel.

Respondents first contend that in the quo warranto case our jurisdiction was limited to the determination of the right of Missouri Association, and of respondents as its purported officers, to continue writing funeral and burial insurance *under the charter of Missouri Association*. They further contend that the judgment of this Court in that case did not and could not deny to respondents the right to issue such contracts of insurance in Missouri except *under the charter of Missouri Association*. We are not so persuaded. Such contentions seem based upon respondents' assumptions that the quo warranto case

296

was one to oust an *existing* corporation from an *existing* franchise regularly granted by the state under corporate charter. In the quo warranto Information the Missouri Association was referred to only as a *purported* corporation, and respondents were charged with unlawfully *purporting* to be a corporation, and that Information *further charged* that respondents "have been unlawfully . . . usurping . . . the franchise . . . of writing and selling funeral and burial insurance . . . in the State of Missouri". That was an action to oust these individual respondents from usurping a franchise and privilege not granted to them by the State of Missouri. State ex rel. Gentry v. Monarch Transfer & Storage Company, 323 Mo. 562, 20 S. W. (2d) 60, State ex rel. Miller v. O'Malley, 342 Mo. 641, 117 S. W. (2d) 319, State ex inf. Miller v. St. Louis Union Trust Company, 335 Mo. 845, 74 S. W. (2d) 348. After that Information was filed Missouri Association was made a party at respondents request, and only incidentally, and only for the purpose of the trust fund and costs. The pleadings, the facts, the stipulation and the judgment show the quo warranto proceeding was purely in personam.

In 1940 we held in the Black case, supra, that Sec. 5014 R. S. Mo. 1929, under which statute Missouri Association in 1934 had been granted a pro forma decree as a benevolent corporation, was unconstitutional and void. Thereupon and thereafter Missouri Association had no corporate existence. We said in State ex rel. Miller v. O'Malley, supra: "An unconstitutional statute is no law and confers no rights. . . . This is true from the date of its enactment, and not merely from the date of the decision so branding it." Missouri Association, therefore, after our ruling in the Black case, had no character of corporate existence and could not of itself be ousted. It was dead. That fact respondents seem to ignore. Missouri Association had no officers. Those *purporting* to be its officers had no such office or official capacity. The only possible respondents in the quo warranto were the individuals who purported to be officers. In State ex rel. Gentry v. Monarch Transfer and Storage Company, supra, we held: "If quo warranto be brought for usurping to be a corporation, it should be brought against particular persons because in disaffirmance of the corporation." Our decree not only ousted respondents from holding themselves out as a corporation, but also ousted them from "usurping and exercising the right franchise and privilege . . . of writing and selling funeral and burial insurance."

Courts recognize the distinction between a quo warranto against a living corporation because it has improperly exercised or has attempted to use a power it never had, and a quo warranto against individuals to oust them from usurping a franchise which the state never granted them. State ex inf. McKittrick v. Murphy et al., 347 Mo. 484, 148 S. W. (2d) 527. In the Murphy case, supra, we

extensively reviewed the scope and purposes of quo warranto and held: " 'A writ of quo warranto is in the nature of a writ of right for the king, against him who claims or usurps any office, franchise, or liberty, to inquire by what authority he supports his claim, in order to determine the right.' Bla. Com., Chases Ed. 752. . . . The writ of quo warranto is not a substitute for mandamus or injunction nor for an appeal or writ of error. It is not to be used to prevent an improper exercise of power unlawfully possessed. Its purpose is solely to prevent an officer or a corporation or persons purporting to act as such from usurping a power which they do not have . . . What is meant by the term 'franchise' as used in connection with the writ of quo warranto? A franchise has been defined as 'A special privilege conferred by government on individuals, and which does not belong to the citizens of the country generally by common right.' "

In Missouri the insurance business is affected with a public interest and is subject to the control and regulations of the state's police power. State ex rel. Mackey v. Hyde, 315 Mo. 681, 286 S. W. 363. Under that power the state withholds the right to engage in such business until the applicant for that privilege or franchise has complied with the statutes. R. S. Mo. 1939, Secs. 6003, 6004, R. S. A., sec. 6003, 6004, State ex rel. Mackey v. Hyde, supra. In State ex rel. Beach v. Benefit Association, 6 Mo. App. 163, 167, it was held: "The exercise of the right of carrying on the business of making assurance upon lives by a corporation in this State, is the assertion of a grant from the State to exercise that privilege, and it is therefore the usurpation of a franchise unless it can be shown that the privilege was granted . . . If then it appears from the facts stated that defendant is carrying on an insurance business, and it shows no authority for the exercise of such a franchise, the State is entitled to a judgment of ouster." In People v. Loew, 44 N. Y. Supp. 42 the court in the following language clearly stated the reasons for holding that the right to conduct an insurance business is a franchise which may be challenged by quo warranto: "As the business of insuring lives, property, credits and fidelity of conduct has become of such large public concern, in connection with the business enterprises and activities of the people of the state generally, such business has essentially become one of a public character; and it has been found necessary by the legislature to guard and protect the people of the state in their dealings with the persons and corporations assuming to act as insurance companies, in the same manner that it has been found essential to deal with the business of banking. The state has now for many years had a governmental department devoted to that purpose, and has placed upon the superintendent or head of that department responsible duties in regard to the supervision of domestic and foreign companies doing business within the state. It has thus been held repeatedly that the

state has the right to regard the business of insurance as one dependent upon the exercise of a franchise which the state has the right to give and to withhold. This franchise right has grown up from a small beginning from necessity, but is not a departure from the general rule characterizing the meaning of the term 'franchise.' It is simply a modern application of the principle governing such privileges, applied to new emergencies. Whatever is of large public concern, so that a want of regulation and control will injuriously affect the public in its general interests, may be the subject of a franchise.''

At the time of filing the quo warranto Information in this court there was no possible question of the ouster of Missouri Association. It was dead and was doing and could do nothing. It was the actions of respondents in continuing to write burial insurance in Missouri, notwithstanding the death of Missouri Association, that gave the state concern. The state sought to oust respondents from exercising a franchise the state had never granted to them and sought to have respondents personally cease and desist from any further writing of burial insurance, as a purported corporation, or otherwise. Our judgment in the ouster case forbade them to do so.

In their brief respondents concede the propriety of the rule we applied in, ▆▆ State ex inf. Miller v. St. Louis Union Trust Company, supra, that quo warranto is proper to oust a respondent from the usurpation of a franchise not granted by the state. Quo warranto was proper against these respondents for that reason. We have carefully considered the cases cited by respondents but they are not in point on the instant facts and do not alter the conclusion which the facts compel. Respondents' argument fails to consider that respondents were also usurping a franchise which only the State of Missouri could grant to them and then only upon their compliance with the state insurance laws. We agree with respondents that our jurisdiction to enter the ouster judgment was not founded upon the stipulation and could not be conferred by consent. But upon the pleadings of the ouster suit this court possessed constitutional jurisdiction to determine by quo warranto whether respondents were usurping a franchise not granted to them by the State. State ex inf. McKittrick v. Murphy, supra, State ex inf. Miller v. St. Louis Union Trust Company, supra. The above mentioned contentions of respondents are not well taken. Quo warranto was a proper procedure against respondents individually and personally to determine by what authority they were purporting to usurp the franchise to write burial insurance in Missouri. By the quo warranto case the state sought to and did oust respondents personally from usurping the franchise of writing funeral and burial insurance in Missouri.

▆▆ Respondents next contend that they should be purged of contempt because our judgment of January 12, 1942 in paragraph 2 thereof, provided ''that the respondents be restrained and enjoined

from soliciting or accepting any new burial contracts on and after the 5th day of January, 1942.'' Respondents contend this Court possesses no jurisdiction to restrain and enjoin. The pertinent portions of the stipulation executed and filed here were as follows:

''WHEREAS, this Court has issued its Writ in this cause predicated upon an information filed by the Relator, charging that the Respondents have usurped and exercised certain rights and privileges without any warrant, charter or grant and without authority of law, and praying that the Respondents shall be ousted from exercising such franchises and privileges; and

''WHEREAS, the Respondents have made their Return admitting the averments of the Information and Writ and confessing the judgment of Ouster; and . . .

''IT IS, THEREFORE, AGREED AND STIPULATED by and between the Relator and Respondents that the Court shall enter a Decree in this cause decreeing and providing:

''1. That the Court issue a Judgment of Ouster in this cause against each and all of the Respondents; such Judgment to become effective and to be in force on the 5th day of April, 1942;

''2. That the Respondents be restrained and enjoined from soliciting or accepting any new burial contracts on and after the 5th day of January, 1942.''

The return and answer of respondents to the Information was: ''Come now each and all of the Respondents in this cause by their attorneys and for answer to the First Amended Information In The Nature of Quo Warranto and to the Writ issued herein, admit the truth of all of the averments contained therein and confess that a judgment of Ouster may be entered against them.''

Under the Constitution of 1875 this Court did not have general and original equity jurisdiction and had no original jurisdiction in injunction. Our jurisdiction in quo warranto at the time of the filing and judgment in the quo warranto case was expressly conferred by Sec. 3 of Article VI of the Constitution of 1875. The above quoted paragraph 2 of our order wherein respondents are ''restrained and enjoined'' may be and is disregarded as surplusage. That portion of our judgment was not necessary to its meaning and does not affect its validity as an ouster order. It was extraneous, superfluous and unnecessary, and may be and should be disregarded. It is apparent from the Information, the Return, the Stipulation signed by the parties and the Judgment that the intention, purpose and agreement of the parties, respondents and Informant, was that respondents should henceforth be ousted from the privilege and should discontinue writing burial insurance in Missouri. That is evident without regard to the choice of words. Respondents were ousted. Under the circumstances of this case, and in this connection the word ''ousted'' as

used in our judgment wherein we said: "That each and all respondents are ousted from purporting, claiming and holding themselves out to be a corporation under the name and style of the Barry County Burial Association of Cassville, Barry County, Missouri, *and from claiming, usurping and exercising the right, franchise and privilege of carrying on the business of writing and selling funeral and burial insurance*", means respondents were to be thereafter excluded from any exercise, directly or indirectly, of the challenged franchise to write funeral and burial insurance in Missouri. The judgment of ouster had the future operative force of itself to prohibit any further exercise of the claimed franchise. The judgment means that from the date of its issuance the respondents should henceforth cease and desist from further exercise of the franchise not merely by use of the pretended authority of Missouri Association, but as well by any subterfuge to which respondents might resort, either personally or through a foreign corporation. This Court has construed the effect of an ouster order in quo warranto cases as meaning that the person or corporation ousted from any such claimed franchise should cease and desist exercising such claimed franchise. State ex inf. Miller v. St. Louis Union Trust Company, supra, State ex inf. Miller v. Mississippi Valley Trust Company, 335 Mo. 872, 74 S. W. (2d) 361, 362, State ex inf. Miller v. Mercantile-Commerce Bank & Trust Co., 335 Mo. 873, 74 S. W. (2d) 362, 363. In State ex rel. Barrett v. First National Bank of St. Louis, 297 Mo. 397, 249 S. W. 619, 625, we said: "The character of a judgment in quo warranto cases is largely within the discretion of the court, and foreign corporations may, under numerous precedents, be prohibited by a general ouster from committing particular illegal acts." (Citing cases.) That respondents were ousted was of itself sufficient to prohibit and such order did prohibit the future exercise of the challenged franchise. The ouster order was a cease and desist order.

The question here is not whether Arkansas Association is doing business in Missouri without a license, or without complying with Missouri laws respecting foreign corporations, or whether its business is interstate in character. We are not now concerned with Arkansas Association as a corporation, nor with its method of doing business. Those matters may be determined on another day in another forum after Arkansas Association as a corporation has had its day in court. But we are here concerned with the individual respondents and whether personally they have been guilty of contempt. We are concerned whether respondents employed Arkansas Association as an instrumentality and subterfuge to violate the judgment of this Court.

Did respondents knowingly disobey our judgment of ouster? If so, did such intentional disobedience to our judgment amount to contempt? These questions present the heart of this controversy. Within what legal limitations must these factual questions be considered?

■ Contempts fall into two major classifications, civil and criminal. Informant insists the record presents a contempt of both a civil and criminal nature. Respondents insist that a criminal contempt has been charged. A civil contempt is one instituted to preserve and enforce the rights of a private party to an action and to compel obedience to a judgment or decree intended to benefit such a private party litigant. State v. Norman, 193 S. W. (2d) 391 (Mo. App.). A criminal contempt results from an act or series of acts directed against the court's dignity which brings a court into disrepute by ignoring its mandates and judgments, or by challenging its authority, or by affronting its majesty as an agency of government, and which affects all the people of the state. In re Willis H. Clark, ex parte, 208 Mo. 121, 144, 145, 106 S. W. 990. While under some circumstances conduct may be both civil and criminal contempt, the instant case is a proceeding for a criminal contempt. This Court has both inherent and statutory ■ power to punish a criminal contempt. R. S. Mo. 1939, Sec. 2028, R. S. A. sec. 2028, Missouri Electric Power Company v. City of Mountain Grove, 352 Mo. 262, 269, 176 S. W. (2d) 612, State ex inf. Crow v. Shepherd, 177 Mo. 205, 76 S. W. 79. Such power is as old as the law itself and stems from the power of the judiciary to protect its dignity and authority and to enforce its judgments. Disobedience of any valid judgment, order or decree of a court, which such court had jurisdiction to enter, is such an interference with the administration of justice as to constitute contempt. Missouri Electric Power Company v. City of Mountain Grove, supra, In re West, 348 Mo. 30, 152 S. W. (2d) 69, Blackmer v. U. S., 284 U. S. 421, 52 Sup. Ct. 252, 76 L. Ed. 375. Willful disobedience of a lawful mandate of a court implies bad faith. State ex rel. Madden v. Padberg, 340 Mo. 667, 101 S. W. (2d) 1003. No man may judge his own case. If one man may determine the law of his own case, all men may do so. If parties make themselves the judge of the validity of a court order regularly entered respecting their conduct or course of action, then the courts become impotent and judicial power becomes a mockery. United States v. John L. Lewis and United Mine Workers of America, 67 Sup. Ct. 677, 91 L. Ed. 595. Until the judgment of a court is set aside by such court upon reconsideration, or is reversed for error upon orderly procedure, its orders must be respected by full obedience. Disobedience of such orders is contempt of its lawful authority and punishable as such. Howat v. Kansas, 258 U. S. 181, 42 Sup. Ct. Rep. 277, 66 L. Ed. 550. United States v. John L. Lewis et al., supra. It is contempt to employ a subterfuge or device in an attempt to evade an order or judgment of a court. 12 Am. Jur. 406.

■ Respondents' return and answer in the instant case does not aver that they have not been writing funeral and burial insurance in Missouri. Their return admits it. Their pleading denies merely that they pretended they would cease writing insurance in Missouri,

and admits that while their preliminary negotiations with the Informant were in progress they secretly incorporated Arkansas Association to do, and that by the instrumentality of Arkansas Association they have done and are doing, the very thing the judgment of this court denied them the right to do. Under the name of Arkansas Association Koon, by letter, advised Missouri policyholders that "we have formed" Arkansas Association, and thus the respondents wrote about 75,000 new policies in Missouri. Policyholders were advised "the only difference in the plan of operation is that all business will be transacted in Eureka Springs instead of Cassville."

Under the circumstances of this case and under the admissions of the return and answer respondents "did . . . organize and incorporate" Arkansas Association "for the purpose of . . . writing, selling, soliciting and accepting funeral and burial insurance in the State of Arkansas and . . . in other states", and in view of the admission that such corporation "is engaged in transacting business in Missouri", we must disregard the corporate entity of Arkansas Association. Courts disregard the fiction of the corporate entity when, as here, a corporation is attempted to be used as a means of accomplishing a fraud upon a court or an illegal act. 18 C. J. S. 380, 13 Am. Jur. 160, and cases cited. Arkansas Association was secretly formed under the laws of another state for the express purpose of avoiding the laws of this state, and of doing the very thing we said in our ouster order respondents could not do. The corporate entity of Arkansas Association cannot avail respondents under these circumstances. Respondents themselves did the things the instant facts tend to show Arkansas Association did. Booth v. Scott, 276 Mo. 1, 205 S. W. 633, 18 C. J. S. 380, 13 Am. Jur. 160.

Some of the "designated" Missouri undertakers kept printed applications of Arkansas Association for policies, solicited contracts, made collections of assessments, issued receipts, made remittances to Eureka Springs, delivered policies and did other acts as agents for respondents. These acts were done with the knowledge of respondents. It matters not that respondents now claim they did not authorize such acts. Where a principal with knowledge of the material facts of the unauthorized acts of another who assumes to act for him, receives and retains the benefits thereof, he thereby ratifies the same. St. Louis Mutual Life Insurance Company v. Walter et al., 329 Mo. 715, 728, 46 S. W. (2d) 166, Walter v. Hassler, 240 S. W. 257 (Mo. App.), 2 C. J. S., p. 1097. Respondents cannot accept the beneficial results of the acts of the "designated" Missouri undertakers and at the same time escape the burdens which that acceptance places upon them. Mutual Life Insurance Company v. Walter, supra.

The obligations of the policies carried on Missouri policyholders were contracted to be and were performed in Missouri, respondents had soliciting agents in Missouri, losses were adjusted and

settlements reached in Missouri, payments upon the obligations of the Missouri contracts were made to Missouri undertakers in Missouri. The facts support the admission of respondents that through the instrumentality of Arkansas Association they were doing business in Missouri. Respondents, upon contracts signed by Koon, advertised over radio station KWTO in Springfield, Missouri. Such contracts were not binding until accepted in Springfield, Missouri. These contracts were to be and were performed wholly in Missouri. Upon those programs respondents solicited policyholders in Missouri. Respondents, under the guise of a foreign insurer were "doing business" within Missouri under such circumstances. Union Mutual Life Company of Iowa v. District Court of the City and County of Denver, 47 Pac. (2d) (Colo.) 401.

At the time they authorized the execution of the stipulation and had the judgment of this Court entered thereon, respondents had already secretly organized Arkansas Association to avoid the laws of this state and to do what our judgment said they could not do. The ouster judgment of this Court in the form in which it was entered without penalty was obtained by such fraud and deceit upon the part of respondents as of itself to constitute a contempt. 17 C. J. S. 12; U. S. v. Pendergast, 39 Fed. Supp. 189. The conclusion is inescapable that respondents' secrecy was intended to deceive and mislead Informant and this Court and that at the time of the entry of our judgment of ouster respondents had no intention whatever to observe the mandates of our judgment.

From a careful study of the evidence adduced before our Special Commissioner, we conclude it has been established beyond any reasonable doubt that each of the respondents intentionally disobeyed our judgment of ouster. In continuing to write and issue policies of funeral and burial insurance in Missouri and in thus making their own private determination of the law, respondents acted at their peril. Their disobedience of our judgment in the quo warranto case is punishable as criminal contempt.

Respondents further contend that they have acted in good faith and upon advice of counsel. Generally it is no defense in a contempt proceeding that the contemnors acted upon advice of counsel. That rule is modified by most courts by recognition of the further rule that where one in contempt acted in good faith *and* upon advice of counsel such facts will be considered in mitigation of both the offense and the punishment. It is the almost universal rule, however, that where the excuse of advice of counsel is a mere pretense, and where the facts establish that the contumacious acts were intentional and lacking in *bona fides,* that such excuse will not be accepted by the courts, even in mitigation. 17 C. J. S. 52.

When we consider the instant facts, we cannot accept respondents oral protestations of good faith. Respondents' return admits and the

304

facts show that Arkansas Association was incorporated to do what we forbade respondents to do. We cannot give such subterfuge our approval. The record is replete with intentional violations of our judgment by these respondents. We cannot find good faith where there appears to have been only intentional and continued violations of our ouster order by the affirmative acts of respondents. As to advice of counsel, the testimony of respondent W. D. Koon that such advice was given is not corroborated by any of his counsel. The only one of his counsel who testified was quite certain no such advice was given. Others of his counsel, although available, were not called as witnesses. The testimony of W. D. Koon upon this question is inconsistent and upon analysis is neither persuasive nor convincing. In any event, the things respondents did bespeak their lack of good faith.

 In view of our conclusion that respondents are subject to punishment as and for a criminal contempt, we next consider that phase of this proceeding. Sentences for criminal contempt are punitive in nature. Such punishments must vindicate the court's authority to have its mandates respected. The interests of orderly government demand that. We must consider the public necessity for compliance with the laws of this state, the need to end the defiance of the respondents, the importance that others in the future comply with the laws above noted, the seriousness of the respondents' attempts to take the law into their own hands and adjudge their own conduct, the extent of their deliberate defiance of our judgment of ouster, their secret organization of Arkansas Association to avoid the laws of this state and their continued use of such subterfuge to do what our judgment of ouster forbade them to do. The contempt has continued since April 5, 1942. Nothing in the record before us indicates that the contumacy has ceased. Respondents deliberately refused obedience to our ouster judgment. Such conduct evidenced complete lack of respect for judicial process and was an intentional interference with the administration of justice. Contempt must be measured by the intent with which it is committed. In re Howell and Ewing, 273 Mo. 96, 116, 200 S. W. 65. We are of the considered opinion that under the principles of law involved and under the instant facts and circumstances the respondents should pay a fine of $25,000. Such fine is therefore assessed and execution shall issue therefor. It is so ordered. All concur.