244 S.W.2d 1005 (1951)
OSBORNE
v.
PURDOME, Sheriff.
SYMPSON
v.
PURDOME, Sheriff.
CABBELL
v.
PURDOME, Sheriff.
Nos. 42752-42754.
Supreme Court of Missouri, en Banc.
December 10, 1951.
Rehearing Denied January 14, 1952.
*1008 Wm. O. Sawyers, St. Joseph, Ira B. McLaughlin, Kansas City, for petitioner, Alfred H. Osborne.
Ira B. McLaughlin, Kansas City, for petitioner, Robert B. Sympson.
J. Arnot Hill, Kansas City, for petitioner, Phil Cabbell.
John W. Oliver, Horace F. Blackwell, Jr., and Albert Thomson, all of Kansas City, Henry H. Fox, Jr., Pros. Atty., of Jackson County, Kansas City, of counsel, amici curiae, for respondent.
HOLLINGSWORTH, Judge.
Habeas corpus. The petitioners are Alfred H. Osborne, Robert B. Sympson and Phil Cabbell. They, with J. Carl James, Matt Jones and Vernon Everage, were jointly charged with and adjudged guilty of criminal contempt in the Circuit Court of Jackson County. James and Everage accepted the sentence imposed upon them. Jones died before being sentenced.
Petitioners Osborne, Sympson and Cabbell were each sentenced to imprisonment in the county jail for a term of eight months, and in addition thereto a fine of $1000 was imposed upon Osborne and Sympson. Upon separate petition of each, writs of habeas corpus were issued to the respondent, Sheriff of Jackson County. His returns recited that petitioners were imprisoned by him under and by virtue of the judgment herein above referred to, a copy of which judgment was attached to each return. Each petitioner thereupon filed his verified answer alleging that his imprisonment was unlawful for the reasons hereinafter discussed, to each of which answers respondent demurred. Pursuant to stipulation, the three cases were consolidated. By consent of the parties the matter is before us for full review upon the record and transcript of the evidence heard in the trial of the contempt proceeding in Division 4 of the Jackson County Circuit Court, Honorable Thomas R. Hunt presiding.
The proceeding, designated a "complaint for criminal contempt", was filed by the Prosecuting Attorney of Jackson County, as informant and complainant, against the six named accused persons as "contemnors". It was also signed by John W. Oliver, Horace F. Blackwell, Jr., and Albert W. Thomson, members of the Jackson County Bar, who had been appointed by the court as amici curiae to assist the prosecuting attorney in determining whether probable cause existed for the institution of the action and, in their respective official capacities, to join with the prosecuting attorney in instituting and prosecuting the action should they determine that probable cause existed. The complaint, in substance, charged the alleged contemnors with confederating and acting, individually and collectively, to impede and obstruct the administration of justice by knowingly undertaking to present and presenting false testimony in a certain action for damages for personal injuries arising out of an automobile collision pending in the Circuit Court of Jackson County, entitled Burton v. Moulder, No. 527,724.
Following the filing of the complaint, an order to show cause was issued to each of the accused. James and Everage filed separate written responses to the order, in which each admitted his part in the aforesaid plan. Petitioners Osborne, Sympson and Cabbell each filed motions for change of venue and to dismiss, both of which motions were overruled. They then filed separate verified answers, followed by motions for judgment on the pleadings, which motions were overruled. Matt Jones filed similar motions, all of which were overruled.
The accused Vernon Everage testified in behalf of the complainant in the contempt proceedings. None of the other accused testified and no evidence was introduced in behalf of any of them.
*1009 Osborne and Sympson are lawyers and were the record and trial counsel for plaintiff in the Burton-Moulder case. James, also a lawyer, was one of the attorneys for plaintiff and participated in assembling the testimony presented in the case, but was not entered as counsel of record. Cabbell and Everage are laymen, as was Jones.
The petition in the case of Burton v. Moulder alleged that plaintiff sustained personal injuries in a collision of his automobile with that of defendant Moulder on March 23, 1948, at the intersection of White Eagle Road and Chrysler Road in the Fairfax District of Kansas City, Kansas; that plaintiff Burton was traveling east in a Ford automobile on White Eagle Road, and defendant Moulder was traveling north in a Plymouth automobile on Chrysler Road; and that the collision occurred in the intersection.
The transcript of the testimony in that case shows that the accused Everage and Jones were offered, sworn and testified as witnesses for Burton. They testified: they witnessed the collision, it occurred east of the center line of the intersection, they were riding in Jones' car north on Chrysler, they saw Burton's car stop at the stopsign, they were going fifty miles per hour, and Moulder's car, proceeding northward at seventy to seventy-five miles per hour, passed them about four hundred feet south of the intersection, and the Moulder car did not slow down before the collision.
In the contempt proceeding, the accused Vernon Everage testified: For several years he had been employed as a janitor at the General Motors Plant in the Fairfax District in Kansas City, Kansas. About two days before he testified as a witness in the Burton-Moulder case on Friday, September 29, 1950, Jones came to his home about seven o'clock at night and, in the presence of his wife, asked him to come out to the car and talk to some fellows about the accident in that case, and said they would give him one hundred dollars. Everage went to the car with Jones and there met Osborne, Sympson and Cabbell. He knew Cabbell and was introduced to Osborne and Sympson. All of them sat in the car; Osborne and Sympson in front and Cabbell, Jones and Everage in the back. Osborne asked him if he would testify in the case. He told Osborne he had not seen the accident and did not know anything about it. Osborne replied that he did not have to know anything about it, that he (Osborne) would tell him how it happened and what he was to say. Osborne promised him one hundred dollars. Sympson gave him a subpoena to give to his foreman so he could leave his work, and Sympson was to pick him up outside the General Motors Plant the next morning to show him where the accident happened. He gave the subpoena to his foreman and Sympson met him the next morning, and they rode to the scene of the accident, one block south of the plant. There they met Jones and Cabbell. Jones got in the Sympson car with them and they went south down Chrysler Road, turned around and drove back up Chrysler Road along the route the Moulder car was supposed to have traveled immediately prior to the collision. Sympson showed him and Jones that Sympson's car was supposed to be Matt Jones' car, and that Jones was supposed to be taking him to work, and that the reason for Jones being in the vicinity was to make an application for a job, and that the Plymouth (Moulder) car was supposed to have passed them going at a high rate of speed. Sympson, in the presence of Cabbell, told him that Cabbell "was acting out the part of the Ford that got hit." The Plymouth was supposed to have hit it just as it got across the street. Sympson told Everage that Cabbell was doing with his car what Burton's car was supposed to have been doing when it pulled out at the time the Plymouth passed "us going at a high rate of speed before the accident occurred." After forty-five minutes of this, Everage, Jones and Sympson went to Osborne's office in the Columbia Bank Building where they met James and Osborne, at which time Everage was introduced to James. Osborne told Everage to keep going over the story as to how the accident happened. James wrote out a statement in the presence of Sympson of what Everage allegedly had told him shortly *1010 after the accident as to how it had happened, and Everage signed it. The statement was dated back to about the time the accident occurred for the reason that, as stated by James, Everage was supposed to have seen the accident and had talked to him about the accident right after it happened. James put the statement on the floor and twisted it around. During the meeting Osborne used three toy cars to show how the Burton car was crossing the street and how the cars were coming down the street when the Moulder car was supposed to have passed the Jones car at a high rate of speed.
That afternoon Sympson, James, Jones and Everage went to a witness room in the courthouse, where they stayed until after five o'clock. Present there were Jones, Sympson, James and Osborne. Sympson and James were there most of the time, but Osborne was in and out. They just kept going over the accident. That afternoon in the witness room at the courthouse, in the presence of Sympson, Osborne gave Everage one hundred dollars in currency. He did not testify that afternoon. The following morning he and Jones returned to Osborne's office, where James and Sympson again went over the accident. Everage then went to the courthouse where he was sworn and testified for the plaintiff. Even though he had not seen the accident, he testified as though he was an actual eye witness to the accident. On the day after he testified, Everage paid a bill at Palace Clothing Company with part of the hundred dollars given him by Osborne.
As against Sympson only, the trial court admitted testimony of Everage that on April 5, 1951, Sympson asked him to come to his office, saying something urgent had come up, and he, Sympson, wanted to talk with him. Sympson asked Everage if he knew about a meeting at the Victoria Hotel, which Everage did not, and said everything would be all right if Matt (Jones) did not say anything about the thing, nothing would ever come of it.
Mrs. Everage testified she heard Jones ask her husband, Vernon, on the evening he went to the car, if he would like to make a hundred dollars.
The General Motors' records showed that Everage left work at 10:30 on September 28th and had not worked on Friday, the 29th, and that he obtained an "early out pass" for Thursday, the 28th. The Palace Clothing Company's records showed Everage's payment of a balance of $10.55 on his bill the day after the trial of the Burton-Moulder case.
Two voluntary statements made by Jones were offered and admitted in evidence as against him only that his testimony in the Burton-Moulder case was false.
Petitioners assert five principal grounds as the basis of their contention that they are unlawfully deprived of their liberty. These are presented under twenty-one subdivisions, in support of which more than one hundred fifty cases, statutes, and other references are cited. For the more expeditious consideration of their many contentions, and to avoid undue repetition, they may be regrouped, as follows:
(1) Upon filing answers to the order to show cause denying the allegations of that order they were entitled to a discharge from the order;
(2) Petitioners were unlawfully deprived of the right of trial by jury in violation of Article I, Section 22(a), of the Constitution of Missouri;
(3) They were denied due process of law in violation of the 14th Amendment of the Constitution of the United States and Article I, Section 10, of the Constitution of Missouri, in that they were denied a trial before an impartial judge; and,
(4) The complaint upon which they were tried was insufficient in form and substance to charge a criminal contempt or support a judgment therefor, there was not sufficient competent evidence to sustain the judgment, and the commitment under which they are imprisoned fails to state the particular circumstances of which they were adjudged guilty.
Petitioners' contention that their sworn denials of the allegations of the order to show cause entitled them to a discharge from the order is based upon these grounds: that criminal contempt is of common law origin and governed by its rules of procedure; *1011 and that under the common law of England, as it existed at the time of its adoption as a basic part of the law of this State, the filing of a verified categorical denial of a charge of indirect criminal contempt disposed of the case, leaving the contemnor punishable only for the crime of perjury if his answer was false.
Such practice, known as "purgation by oath", was in vogue in England for a period of time, but has long since been repudiated by the United States and most of the States. 17 C.J.S., Contempt, § 83(b), p. 107 et seq. Mr. Justice Cardozo wrote a fitting epitaph to that doctrine in behalf of the Supreme Court of the United States in the case of Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 471, 77 L.Ed. 993: "The oath of a contemnor is no longer a bar to a prosecution for contempt.
"Little was left of that defense after the decision of this court in United States v. Shipp, 203 U.S. 563, 574, 27 S.Ct. 165, 51 L.Ed. 319, 8 Ann.Cas. 265. Since then there has been no purgation by oath where an overt act of defiance is the gist of the offense. * * *
"The time has come, we think, to renounce the doctrine altogether and stamp out its dying embers. It has ceased to be a defense in England since 1796. Matter of Crossley, 6 Term Reports 701. It has been rejected generally in the states. [Citing cases.] It has even lost, since the decision in the Shipp Case, the title to respect that comes of a long historical succession. It has taken its place with ordeal and wager of law and trial by battle among the dimly remembered curios of outworn modes of trial."
It never was the law in this State. The statute by which we adopted the common law of England specifically includes only the common law in force prior to the fourth year of the reign of James the First, § 1.010, RSMo 1949, which was the year 1607, Industrial Acceptance Corp. v. Webb, Mo.App., 287 S.W. 657, 660. The doctrine of "purgation by oath" was not known in England until long after that year. 41 Harvard Law Review 51.
Much of the argument made in support of the remaining several assignments is based upon petitioners' assertion that criminal contempt is a criminal case and a judgment of guilt thereof is a judgment in a criminal case. This makes it necessary to determine whether criminal contempt is a specific crime and is to be tried as such.
The charge in this case is without question a charge of criminal contempt, as distinguished from civil contempt. In re Clark, 208 Mo. 121, 106 S.W. 990, 15 L.R.A.,N.S., 389; In re Shull, 221 Mo. 623, 121 S.W. 10; State on inf. McKittrick v. Koon, 356 Mo. 284, 201 S.W.2d 446. While some of the alleged contemnors' acts were charged to have been committed in the presence of the court, yet others were without the presence of the court, and we will treat of the action as an indirect criminal contempt proceeding, requiring complaint, notice and hearing, as was done in this case, rather than as a proceeding to be dealt with summarily, as in direct criminal contempt.
In both the Clark and Shull cases, supra, there are statements that a criminal contempt is a specific criminal offense and a conviction thereof is a judgment in a criminal case. These statements, lifted out of their context, would seem to support petitioners' contention, but when read in the light of the matter under consideration in each case, they do not hold that a criminal contempt proceeding is a criminal prosecution within the meaning of the Constitution, statutes or case law of either the United States or the State of Missouri. The effect of the holding in each case is that criminal contempt, is criminal in nature; and that the accused (in indirect criminal contempt proceedings, as distinguished from the summary action in direct contempt) can only be adjudged guilty after due notice, reasonable opportunity to defend and the presentation of sufficient evidence to warrant the judgment; and that a valid commitment in any criminal contempt case must contain the particular circumstances of the offense. Section 476.140, RSMo 1949, so provides.
In the case of State ex rel. Chicago, B. & Q. R. Co. v. Bland, 189 Mo. 197, *1012 88 S.W. 28, 30, the nature of the proceedings in criminal contempt is clearly stated: "In many cases contempts are designated as `criminal' where an attempt at classification may not have been in mind, but the court had in view, by the use of the word, merely an epithet which might fill a wholesome office as a deterrent. * * * It is settled law that every constitutional court of common-law jurisdiction has the inherent power to punish for contempt, and cannot be shorn of such power by statute. It is settled law that contempt cases are sui generis, that one court may not try a case of contempt against another, that contempt proceedings are summary, that there is no constitutional right to trial by jury, and that no change of venue will lie."
In Conley v. United States, 8 Cir., 59 F. 2d 929, 935, it was stated: "There is no fixed formula for contempt proceedings, and technical accuracy is not required. * * *
"`Contempt proceedings are sui generis, being neither civil actions nor prosecutions for offenses within the ordinary meaning of such terms, and technical accuracy in such proceedings is not required, and contention that information was bad for duplicity was therefore without merit.' * *
"The power to punish for contempt inheres in all courts. Such proceedings are sui generis, and are `neither civil actions nor criminal prosecutions, as ordinarily understood.'"
And in 12 Am.Jur. § 67, p. 435, it is said: "The principle prevails that the proceedings are criminal only in form since their object is to compel obedience to, and respect for, the court, and not to punish a public offense." See also Myers v. United States, 264 U.S. 95, 44 S.Ct. 272, 68 L.Ed. 577; Ex parte Grossman, 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527; Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375; 17 C.J.S., Contempt, § 62, page 71.
We think the fallacy of petitioners' contention is readily demonstrable. All courts of record in this State have both inherent and statutory power to punish a criminal contempt, committed within or without their presence. §§ 476.110-476.160, RSMo 1949; State ex rel. Pulitzer Pub. Co. v. Coleman, 347 Mo. 1238, 1239, 152 S.W.2d 640, 646, 647; State ex rel. Gentry v. Becker, 351 Mo. 769, 174 S.W.2d 181, 183; State on inf. McKittrick v. Koon, 356 Mo. 284, 201 S.W.2d 446, 454-455, and cases therein cited. In order to carry out that power such courts perforce must hear, determine and adjudge the facts. The Constitution does not invest either the Supreme Court or the Courts of Appeals with original jurisdiction in criminal actions, and the probate courts have no criminal jurisdiction whatsoever, yet all have the power to punish for contempt. It would be anomalous indeed to hold that a criminal contempt committed against either of those courts should be tried under the criminal code; and even more so to hold that the accused was entitled to a trial by jury. Certainly there is no authorized procedure therefor. And it would be equally anomalous to hold that the law gives an alleged contemnor of the circuit court a right of trial by jury, and at the same time deny it to alleged contemnors of the appellate or probate courts. Clearly, contempt proceedings are not criminal cases within the meaning of the Constitution, statutes and case law of Missouri.
Petitioners further contend that Article I, Section 22(a) of the Constitution of Missouri, which provides that the right of trial by jury, as heretofore enjoyed, shall remain inviolate, entitles them to a trial by jury. They trace this provision through our several State Constitutions from that of 1820 to the present Constitution; aver that it was translated from the Magna Charta; that in 1816 the Missouri Territorial Assembly adopted the common law of England in substantially the same wording as § 1.010, RSMo 1949; that indirect criminal contempt was a criminal offense at common law and is a criminal offense in Missouri; and that, inasmuch as the Magna Charta forbade the trial of any person for a criminal offense except by indictment and to a jury, petitioners were entitled to trial by jury. This contention was considered at some length and denied in the case of State ex rel. Pulitzer Pub. Co. v. Coleman, supra. We there expressly held *1013 there was no constitutional right of trial by jury in an indirect criminal contempt case. See also State ex inf. Crow v. Shepherd, 177 Mo. 205, 76 S.W. 79; 35 C.J. § 99, p. 194; 50 C.J.S., Juries, § 79.
The contention that petitioners were denied a trial before an impartial judge is predicated upon two grounds: (a) that the pleadings admit Judge Hunt was not impartial, and (b) that by the filing in the circuit court of an affidavit of each of petitioners, supported by affidavits of two reputable persons, as provided by § 545.660, RSMo 1949, Judge Hunt was divested of jurisdiction, and another judge should have been called in to try the cause.
Each of the answers of petitioners filed in this court to the returns of respondent alleged: "That said Honorable Thomas R. Hunt was, in fact, prejudiced against this petitioner and in said cause and was not wholly unprejudiced." It is argued that the demurrers filed to each of the answers constitute an admission that Judge Hunt was not impartial, and that, therefore, upon the face of the record, they were deprived of due process. The allegations in the answers are mere conclusions, nothing more; and a demurrer does not admit mere conclusions of the pleader. Therrien v. Mercantile-Commerce Bank & Trust Co., 360 Mo. 149, 227 S.W.2d 708. Because they allege that Judge Hunt was not "in fact" impartial adds nothing to the allegation; it is still a conclusion. No fact or circumstance is alleged or cited to establish or support it.
This case is presented here upon the record in the trial court. The only suggestion of prejudice made as to the trial court was the aforesaid affidavits, which stated the bald conclusion of each affiant that Judge Hunt would not afford him a fair trial. Such an ex parte affidavit constituted no proof whatsoever of the conclusions therein stated. Neither did it, under the statute, § 545.660, disqualify him. That section provides that "When any indictment or criminal prosecution shall be pending in any circuit court or criminal court" the judge shall be deemed incompetent to sit in the cause when affidavits like the above mentioned are filed. It is applicable only to criminal cases.
While no change of venue lies in a criminal contempt case, State ex rel. v. Bland, supra, yet, where conditions do not make it impracticable and delay may not injure public or private rights, a judge, who by reason of the nature or facts of the case cannot give the accused an impartial trial, should not sit, but should call in another judge, 12 Am.Jur. § 66, pp. 433, 434; and a failure to do so would deprive the accused of due process. State ex rel. McAllister v. Slate, 278 Mo. 570, 214 S.W. 85, 8 A.L.R. 1226. See also Ex parte Nelson, 251 Mo. 63, 157 S.W. 794; State ex rel. Pulitzer Pub. Co. v. Coleman, supra. We have carefully examined the entire record and have not found the slightest indication of any prejudice against petitioners or either of them. Throughout the trial the proceedings were conducted with the utmost concern for their rights. The evidence in the case presents no issue that in and of itself would tend to prejudice the judge. He was not aware that the alleged contemptuous acts were being committed until long after the trial of the Burton-Moulder case. The offense arises out of no colloquy or encounter with the judge that would tend to arouse his passion or ill will. The record presents no indication whatsoever that petitioners did not have a fair trial before an impartial judge.
The next contention is that the complaint is fatally defective and did not invest the court with jurisdiction to adjudge the merits of the cause, because (a) it was not verified, (b) perjury (and subornation of perjury) does not constitute contempt, and (c) the complaint is vague and indefinite and fails to state the particular circumstances of the offense charged.
It is urged that § 545.240, RSMo 1949, requiring that informations filed by the prosecuting attorney in criminal prosecutions shall be verified by his oath or by the oath of a competent witness, makes it mandatory that the complaint in this case should have been so verified. What we have already said on that score disposes of this contention.
*1014 We know of no law in this State requiring the complaint to be verified and are cited to none. Our contempt statutes do not require it. The complaint itself is not accepted as proof of the facts and constitutes no evidence. Petitioners had the same hearing they would have had if the complaint had been verified. The prosecuting attorney filed it ex officio. A similar complaint filed by the attorney general was approved without question in the case of State ex inf. Crow v. Shepherd, 177 Mo. 205, 76 S.W. 79. Three reputable members of the bar, appointed as amici curiae, to determine whether there was probable cause to file the complaint, also signed it, thereby certifying, in effect, that there was probable cause for its filing. The contention is without merit.
In support of their contention that perjury (and, consequently, its subornation) does not constitute contempt, petitioners cite Ex parte Creasey, 243 Mo. 679, 148 S.W. 914, 921, 924, 41 L.R.A.,N.S., 478. In that case, a circuit judge undertook to summarily determine that certain testimony then and there given by a witness before a grand jury was perjury and to summarily adjudge the witness guilty of contempt by reason thereof. Whether that case is authority for petitioners' contention that perjury alone, under any and all circumstances, does not constitute contempt, we need not here decide. Petitioners are not charged with perjury. Osborne and Sympson, sworn officers of the court, and Cabbell, their alleged lay confederate, are charged with procuring, coaching, rehearsing, causing and paying false witnesses to give perjured testimony in a court proceeding, for the purpose of impeding and obstructing the administration of justice. That such a sordid, reprehensible scheme and its execution would impede and obstruct the administration of justice cannot be gainsaid.
We have found no Missouri case involving such a charge, but there are many cases from other jurisdictions. In State v. Havel, 120 Neb. 832, 235 N.W. 584, 585, the accused was charged with inducing witnesses to testify falsely for him. The court said: "When one induces and arranges with and influences witnesses to testify falsely in an action not then pending, and in accordance with said plans, at the time of the trial, calls the said witnesses to testify in his behalf and they testify falsely, such action constitutes contempt.
"The procuring of false testimony hinders and interferes with the administration of justice. It puts the witnesses and the procurer in the position of standing out against the authority of the court and defeats its effort and purpose to do justice between the parties." See also Ex parte Savin, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150; Keeney v. United States, 7 Cir., 17 F.2d 976; United States v. Ford, D.C., 9 F.2d 990; Taylor v. State, 112 Neb. 259, 199 N.W. 509; 13 C.J. § 48, p. 38; 17 C.J.S., Contempt, § 31, pages 46, 47.
Very briefly summarized, the complaint alleges these facts:
(1) The case of Burton v. Moulder, No. 527,724, was tried in Division 4 of the Circuit Court of Jackson County, Missouri, beginning September 27, 1950.
(2) Petitioners Osborne and Sympson appeared as attorneys of record and acted as trial counsel for plaintiff in that case.
(3) James, a lawyer, did not appear of record as trial counsel for plaintiff Burton, but was associated in the preparation and trial of the case as an attorney for Burton.
(4) Jones and Everage appeared and testified on September 29, 1950, as witnesses for plaintiff in the trial of that case.
(5) Petitioners Osborne, Sympson and Cabbell confederated with each other, and individually acted, to present, and did present, the testimony of Jones and Everage as to "the occurrences out of which the lawsuit of Burton v. Moulder arose."
(6) Jones and Everage had actually not witnessed these occurrences and petitioners knew they had not.
(7) Petitioners located Jones and Everage and arranged for them to so testify and coached them as to what false testimony they should give.
*1015 (8) Petitioner Osborne promised to pay, and did pay, Jones and Everage $100 each for so testifying.
(9) It then alleged that the conduct of the six alleged contemnors "tended to interfere and did in fact, impede, wrongfully influence, corrupt and obstruct the due and proper administration of justice in the State of Missouri and in this Court, and that such acts and action does under the law constitute contempt of this Court which is properly punishable as a constructive criminal contempt."
All of the essential and substantive facts and the nature of the charge are alleged. That is sufficient.
The sufficiency of the evidence need not be discussed at length. It speaks for itself; it substantiates the charge in the complaint, and was not denied. The trial judge heard and saw the witnesses. We cannot say he was not justified in adjudging petitioners guilty.
In this connection, however, it is urged that Cabbell was merely present during the meeting at Everage's home and at the rehearsal held at the scene of the automobile collision involved in the Burton-Moulder case, and that he did not participate in any of the arrangements. Cited in support of this contention are State v. Bresse, 326 Mo. 885, 33 S.W.2d 919, and other cases of like import. The evidence does not bear out the contention. Cabbell came to Everage's home with Osborne, Sympson and Jones. He sat in the car and heard the arrangements made for Everage's perjured testimony and for the meeting at the scene of the collision on the following morning. When Everage and Sympson drove to the scene on that morning, they there met Jones and Cabbell in Cabbell's car. Jones got into the car with Sympson and Everage. Sympson, in the presence of Cabbell, told Everage that Jones was supposed to be "carrying" Everage to work that morning (the morning of the collision) in his (Jones') car, and Sympson told Everage that Cabbell "with his car he was acting out the part of this Ford that got hit." This testimony, if believed, and the court did believe it, fully warranted the finding that Cabbell was aiding and abetting in the conspiracy and liable as a principal. State v. Bresse, supra.
It is further urged that § 546.280, RSMo 1949 rendered Everage incompetent to testify in this case. That statute provides for the discharge of a co-indictee in a criminal case that he may be a witness for the state. For the reasons heretofore stated it is not applicable here. But, even in a criminal case, an indictee who has pleaded guilty prior to trial of his coindictee is a competent witness against the co-indictee. State v. Woods, 346 Mo. 538, 142 S.W.2d 87. Everage had so pleaded and was a competent witness under criminal procedure.
The judgment and commitment extends through fourteen pages of the transcript. It sets forth with particularity the entire history of the case from its inception to its conclusion, the jurisdictional facts, full details of the evidence, the finding of the court that the evidence established the guilt of petitioners (and the other accused) beyond a reasonable doubt, that their acts constituted criminal contempt of court, adjudged them guilty and assessed their punishment. It is sufficient and complies with every requirement of the statutes and law of this State.
The writs herein issued are quashed.
HYDE, DALTON, LEEDY, and TIPTON, JJ., and ELLISON, C. J., concur; CONKLING, J., concurs in separate opinion filed.
CONKLING, Judge.
I concur in the conclusions stated in the principal opinion and in all that is said therein.
That opinion rules adversely to the petitioners the contention made in their brief that "there was not sufficient competent evidence to sustain a judgment of * * * criminal contempt." Hereinbelow appear my further views as to that portion of the principal opinion. It is unnecessary to here re-state in great detail the facts which the principal opinion reveals.
Charged with "procuring, coaching, rehearsing, causing and paying false witnesses *1016 to give perjured testimony in a court proceeding, for the purpose of impeding and obstructing the administration of justice" the petitioners have now had their days in court under the recognized, approved and required procedures. Evidence amply supporting all the allegations of the complaint for criminal contempt was received in evidence. The petitioners stood mute. Nor was any witness offered by them. Petitioners were found and adjudged guilty of criminal contempt. After sentence therefor, they were granted our writs of habeas corpus and here jointly contend there is no sufficient competent evidence of their guilt.
From the foregoing and from the record before us we must assume as true (and it is not so much as denied) that: Petitioners Osborne and Sympson, then attorneys and sworn officers of the court, were counsel for plaintiff Burton in the Burton-Moulder case; knowing that Everage and Jones did not witness the automobile collision and that the latter two knew nothing whatever about the facts thereof the petitioners Osborne and Sympson nonetheless told them what the latter named two desired that Everage and Jones testify to, coached the false witnesses in such false testimony, had them falsely testify in court and Osborne corruptly paid Everage for so falsely testifying; and upon the trial of the Burton-Moulder case, Everage and Jones were called as witnesses by petitioners Osborne and Sympson (as counsel for plaintiff) and Everage and Jones falsely testified (as arranged by Osborne and Sympson) as to the purported details of that automobile accident. The petitioner Cabbell was with Osborne and Sympson at the time the latter two persuaded Everage to give such false testimony.
And now, in this proceeding, Osborne and Sympson, who were lately armed with a license to practice and have been purporting to practice law, make the unthinkable and not even fairly debatable contention that the just above set out facts do not sustain a judgment of criminal contempt. The principal opinion most properly overrules such contention. Authorities, though available need not be here cited.
As bearing upon the bona fides of petitioners' instant contention we take notice of our own records and files. On June 19, 1951, the Advisory Committee under our Rule 5, filed informations in this Court against the petitioners Osborne and Sympson praying therein the disbarment of the last named two from the practice of law and alleging as grounds therefor (among other grounds) the instant facts as to the Burton-Moulder case. On November 29, 1951, there was filed in this court the surrenders of their licenses to practice law, theretofore voluntarily surrendered by the petitioners Osborne and Sympson. It should be observed in passing that if petitioners Osborne and Sympson are sincere in their instant contention that these facts are "not sufficient competent evidence to sustain a judgment of * * * criminal contempt" then their surrenders of their licenses to practice law in Missouri have come quite late.
It is but a truism which should not have to be stated that the streams of justice must be kept free from all impurities. That general principle is accepted by nearly all. It is denied by no right-thinking, freedomloving person. The trial courts of general jurisdiction wherein most causes are originally filed and wherein factual issues are generally determined by juries are considered by most of the people to represent and to personify the very majesty of the law itself. Those are the only courts of which most of the people know. And most of the people know those courts. Those who serve therein that the truth of tendered issues may be there primarily determined (the judges, parties to causes, jurors, witnesses, court officers, including lawyers, and attaches) must be protected from imposition, improper influence, corruption, duress, perjury and subornation of perjury, fear and harassment.
In no other way may the difficulties and differences of citizens be rightly and justly determined. In no other way may the rights of the individual or a group of the people be fully protected and the Bill of Rights be given life and meaning and force. Under no other circumstances may the law and its various processes become an integrated *1017 philosophy of the people or truly represent the securities and the certainties of a way of life the people seek to attain. When the people through their courts cease to be alert and become insensitive to those things or to those persons who would destroy the faith of the citizen in the judicial process, when lawyers do not have or when they lose that vital sense of honor so basic to a civilized society, then will the people perish though they continue to exist. When corruption or perjury or subornation of perjury are allowed to permeate the trial of causes; or, when there is any pollution whatever at any point in the processes of the administration of justice or of government, the courts and the democratic processes then will fall into disrepute deserving the condemnation of the profession and the contempt of the layman, and the judicial system as now known and recognized will head for oblivion.
Because of the confidential nature of the professional relationship and his almost unlimited opportunity to take advantage of those less learned, it is traditionally expected and demanded of the lawyer that he subscribe without mental reservation to a higher code of conscience; that he walk through life "in the ranks of honour"; that he despise fraud, dishonesty, subterfuge and deceit; and that he at least know that "a good name is rather to be chosen than great riches".
But, however, vigilant the courts may be with the aid of character committees and improved machinery governing admissions to the bar, the legal profession as a whole cannot close its eyes and thereby escape its responsibility for the contribution of a few of its members to the present low level of public morals. Nor can the courts shrug off or ignore their responsibility for vigilant, incisive and carefully considered action when such facts as instantly appear are dragged out into the light of day.
Under the facts of record and under the applicable law Judge Hunt was clearly justified in finding and adjudging the petitioners guilty of contempt. I agree that our writs of habeas corpus heretofore issued herein be quashed.