**In the Matter of Indirect Criminal Contempt Proceedings Against Don McMILIAN, Petitioner,**

v.

**Sheriff Robert RENNAU, Respondent.**

**No. WD 32176.**

Missouri Court of Appeals, Western District.

June 30, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 4, 1981.

John J. Phillips, Independence, for petitioner.

Robert Frager, Asst. Pros. Atty., Kansas City, for respondent.

Before WASSERSTROM, C. J., and SHANGLER, DIXON, SOMERVILLE, TURNAGE, CLARK and MANFORD, JJ.

CLARK, Judge.

This is an original proceeding in habeas corpus on the petition of Don McMilian alleging his unlawful detention and imprisonment by the Sheriff of Jackson County.[1] Our writ issued commanding that return be made showing such legal cause as might be for the detention. The return exhibited a judgment of contempt found against McMillian (sic) by the Circuit Court of Jackson County and a warrant ordering McMili-

---

1. Throughout, the pleadings and orders have referred to petitioner's detention by the Sheriff of Jackson County in the Jackson County Jail. Under the Constitutional Home Rule Charter adopted November 3, 1970, and amended August 8, 1978, the sheriff in Jackson County has no responsibility for correctional institutions or inmates. This court, sua sponte, has modified the proceedings by addressing its writ to the Director, Jackson County Department of Corrections.

an's commitment for a term of ten days as punishment. McMilian's response to the return admits prospective detention pursuant to the warrant but denies the lawfulness of the order. As briefed and argued here, two points are asserted: (1) the acts committed were not within the plenary jurisdiction of the court to punish for contempt, and (2) the process was procedurally defective.

■ In habeas corpus, the petition is a preliminary pleading which drops out of the case when the return is made. That return, together with the traverse by way of reply, form and define the issues in the case. *Ockel v. Riley*, 541 S.W.2d 535, 536 (Mo. banc 1976); Rules 91.16 and 91.28. Because the pleadings and exhibits ordinarily comprise the entire record in habeas corpus, Rule 91.28 requires that a denial of the return be under oath. If the traverse is not verified, the allegations of the return must be taken as true. *Houston v. Hennessey*, 534 S.W.2d 52, 54 (Mo.App.1975). In this case, the reply denying the return was neither signed by McMilian nor verified, and the cognizable and relevant facts are therefore derived from the return and the hearing transcript and may be succinctly stated.

On September 10, 1980, McMilian telephoned the court with a request that he be permitted to speak with Judge Gant regarding criminal charges in a pending case involving McMilian's son. When informed by the bailiff that the judge would not engage in ex parte discussions about a pending case and that McMilian should contact the attorney representing his son's interests, McMilian stated to the bailiff: "Tell Judge Gant that all judges are full of shit and tell Judge Gant to stick it up his fucking ass." The bailiff relayed the message to Judge Gant and a proceeding in contempt followed.[2]

■ McMilian first contends that the contempt judgment finds no sanction under § 476.110, RSMo 1978 because no act of McMilian was committed in the court's presence and he made no resistance to any lawful process of the court. Without any rational explication, respondent asserts that the statute does provide jurisdictional authority here because McMilian's contemptuous and insolent behavior tended to impair respect for the authority of the court. That contention is unsound. By express terms, jurisdiction to punish for contempt under the statute for contemptuous or insolent behavior is limited to acts " * * * committed during (the court's) session, in its immediate view and presence * * *." § 476.-110(1), RSMo 1978. It is unnecessary here to consider whether a direct telephone communication to the judge could, under appropriate circumstances while the court was in session, amount to "immediate view and presence." The conversation with the bailiff was only a communication through an intermediary who was not, himself, the object of any vilification. The statute is plainly inapplicable.

■ Despite absence of statutory authority in this case to support the adjudication in contempt, the proceeding is not necessarily infirm for want of jurisdiction. Constitutional courts of common law jurisdiction additionally possess, by the nature of the judicial office, an inherent power to punish for contempt of their authority. *State ex rel. Girard v. Percich*, 557 S.W.2d 25, 36 (Mo.App.1977). That authority extends to protect, preserve and vindicate the power and dignity of the law itself. *Teefey v. Teefey*, 533 S.W.2d 563 (Mo. banc 1976); *Ramsey v. Grayland*, 567 S.W.2d 682, 686 (Mo.App.1978). The question on McMilian's first point is whether the facts in this case justify invocation of inherent contempt power.

■ Before proceeding, it is appropriate to identify the genre of contempt here at issue. Contempts are said to fall into four categories—civil and criminal, direct

---

2. The hearing transcript does not contain the documents which initiated the contempt proceedings and respondent's return shows only the judgment of contempt and the warrant of commitment. Judge Gant did not sit upon the adjudicatory phase of the case, but apparently did cause an order to be issued which commenced the prosecution. We assume the disqualification of Judge Gant to have been processed as required by Rule 36.01(b).

and indirect. Civil contempt is intended to benefit a party for whom an order, judgment or decree was entered and is designed to coerce compliance while criminal contempt is punitive and acts to protect the judicial system as a method established by the people to solve disputes. *Mechanic v. Gruensfelder,* 461 S.W.2d 298, 304 (Mo.App. 1970). A direct contempt is one that occurs in the immediate presence of the court (in facie curiae), while an indirect contempt is an act outside the court but tending to degrade or make impotent the authority of the court or to impede or embarrass the administration of justice. *Curtis v. Tozer,* 374 S.W.2d 557, 568 (Mo.App.1964). The distinction between civil and criminal contempt is reflected in the content of the judgment, whether the remedy is coercive or punitive. In direct contempt cases the court is entitled to act summarily while in cases of indirect contempt the alleged contemnor is entitled to procedural rights of notice and hearing.

McMilian's case is one of indirect criminal contempt. No coercive remedy was imposed to benefit any litigant, only punishment to vindicate the court's authority and dignity in the face of McMilian's remarks. The indirect nature of the contempt is confirmed by the character of the proceeding, with notice and hearing. The question, therefore, is whether McMilian's conduct amounted to indirect criminal contempt for which punishment could be imposed.

By its nature, the court's inherent power to punish for contempt has imprecise boundaries essentially ascertainable only by reference to particular facts. In general, however, punishment for criminal contempt has been defined as a recourse necessary to vindicate the authority of the court and to deter future defiance. *Chemical Fireproofing Corp. v. Bronska,* 553 S.W.2d 710, 715 (Mo.App.1977). Because the subjection of individual freedom by expression or action is the consequence when a court's power of contempt is exercised, the ultimate question is whether advancement of the general interest in an effective judicial system warrants imposition of restraint on the right of the individual to criticize and disparage.

The present case is difficult to classify because the import of McMilian's two-phase comment addresses no particular case or action by the court. This circumstance may be attributable, in part, to the influence of intoxicants on McMilian who expressed inability to remember the conversation. At face value, the first portion of McMilian's statement was obviously a general slander on the judiciary. The second phrase was unconnected with any particular object of McMilian's ire, and thus is considered to be a common gutter expression of general defiance.

McMilian actually expressed no criticism of past or contemplated action by the court in any pending case and he cannot be charged with an attempt, by his remarks alone, to influence any decision by the court or to impede the judicial function. In oral argument, respondent contended that disqualification of Judge Gant in the criminal case for McMilian's son would be a necessary consequence of McMilian's remarks and that such amounted to sufficient interference with orderly processing of the court's business to justify recourse to punitive contempt. Aside from the relatively minor inconvenience entailed in the transfer of one case, the argument fails because it lacks support in the record. At no time in prosecution of the contempt was any showing made that transfer of any criminal cases occurred nor did the charge against McMilian raise that contention. Invocation of the court's power of contempt here rested solely on a perceived necessity to punish McMilian for his vituperative abuse of the court in general and Judge Gant in particular.

■ No reported Missouri case appears to have confronted the necessity to define inherent authority of the court to invoke contempt powers in a situation where, as here, the alleged contemnor has defied no particular order, has created no public disturbance and has brought to bear no influence on the outcome of a pending case. There can be no doubt, however, that the court derives and exercises inherent contempt

power only in those situations where administration of the judicial enterprise necessitates subjugation of other rights, including the rights of persons to freely and evenly intemperately express their minds. If the judicial function is not integrally threatened by the allegedly contemptuous expression, then there is no inherent contempt power to exercise. As a measure applied to evaluate the degree of threat in allegedly contemptuous conduct, the theory of a clear and present danger has evolved.

The "clear and present danger" concept appears first to have been developed in *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919) where the abridgment of free speech and press was acknowledged to be a casualty in contempt cases. The doctrine was more fully developed in *Bridges v. State of California*, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941), which is most often cited as the authority in contempt cases. The test to be employed in determining whether a given expression, statement or publication was sufficiently grievous to support contempt punishment was described in the following terms:

"What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." *Bridges* at 314 U.S. 263, 62 S.Ct. 194.

The court further observed:

"The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." *Bridges* at 314 U.S. 270–271, 62 S.Ct. 197.

In *Pennekamp v. Florida*, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946), a judgment of contempt had been rendered for published comment critical of administration of criminal justice by the Circuit Court of Dade County and charging a lack of integrity by the judges of the court. *Pennekamp* bears some similarity to the present case in that the comment was generally addressed to the judiciary, but was more specific in alleging misconduct with regard to particular matters. In his concurring opinion to the principal decision reaffirming *Bridges v. California, supra*, and the clear and present danger doctrine, Mr. Justice Murphy stated:

"That freedom covers something more than the right to approve and condone insofar as the judiciary and the judicial process are concerned. It also includes the right to criticize and disparage, even though the terms be vitriolic, scurrilous or erroneous. To talk of a clear and present danger arising out of such criticism is idle unless the criticism makes it impossible in a very real sense for a court to carry on the administration of justice." *Pennekamp* at 328 U.S. 369–370, 66 S.Ct. 1048.

*Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) involved published criticism of the action of a judge in a particular case and a judgment of contempt which followed. The contemptuous remarks described the court's rulings a "travesty on justice" and otherwise demeaned the ability of the judge to provide a fair trial. The case followed the previous rule of *Bridges* and *Pennekamp* as to clear and present danger measured not by the content of the intemperate and unfair criticism alone but by the impact on judicial action. The case further defines clear and present danger in the following terms:

"The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." *Craig* at 331 U.S. 376, 67 S.Ct. 1255.

Finally, in this sequence of United States Supreme Court cases, came *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). Wood, a county sheriff, was convicted of contempt for remarks questioning a grand jury investigation of improprieties in voting. The record disclosed no evidence indicating how the statements by Wood affected or impeded any judicial process, only the conclusion by the state court that a clear and present danger to the fair administration of justice was presented. The opinion instructs not only that clear and present danger remains the test in criminal contempt cases, but that the record must actually show a substantive evil actually designed to impede the course of justice.[3]

■ The contempt judgment must fail here for want of inherent contempt authority. A prerequisite to exercise of that authority was a demonstrated impediment to the judicial process, real, threatened and imminent. No evidence was offered to show how McMilian's statement had affected the judicial function in any pending case. The bare fact of the communication and its content do not permit the inference that some interference threatened the administration of justice. Although Judge Gant's sensibility was no doubt affected when the remarks were conveyed to him, any consequence to the judicial system is remote, conjectural and speculative. Moreover, McMilian's remarks, however offensive and boorish, were limited to the ears of the bailiff alone and were far less egregious than the widely published statements in *Bridges, Pennekamp* and other cited cases.

Cases cited by respondent and contended to approve contempt punishment for communication of vulgarities to judicial personnel are not persuasive. *State v. Sax*, 139 N.J.Super. 157, 353 A.2d 113 (1976) involved a letter with which the contemnor transmitted payment of a parking fine and which contained an obscenity. The opinion affirming a contempt conviction relies only on a general statement that public interest requires respect for the courts. The result is untenable in the light of *Bridges* and *Pennekamp*. *Saunders v. State*, 319 So.2d 118 (Fla.App.1975) was a case in which a witness, while leaving the stand, uttered a profanity to the judge. As a direct contempt, the case is distinguishable from and inapplicable to the present case. *People v. Hagopian*, 343 Ill.App. 640, 99 N.E.2d 726 (1951), also cited, involved attempted bribery of a juror and has no relevance here. Other cases cited by respondent are not authoritative or are inapposite.

In accordance with the views here expressed, McMilian's conduct, however offensive to accepted social and behavorial standards, posed no threat to the functioning of the judiciary in general or to the particular division of the Jackson County Circuit Court which was the object of McMilian's ire, and the inherent contempt power of the court was therefore improvidently invoked. Disposition of the case on this ground renders unnecessary any discussion of McMilian's complaint that process was deficient.

The petitioner is ordered discharged.

SHANGLER, DIXON, SOMERVILLE and TURNAGE, JJ. concur.

WASSERSTROM, C. J., dissents in separate opinion; MANFORD, J., concurs in dissent.

WASSERSTROM, Chief Judge, dissenting.

The majority opinion interweaves two separate but related arguments to support its conclusion that McMilian was not guilty of contempt. The first strand of argument is that "[t]he contempt judgment must fail here for want of inherent contempt authori-

---

3. In a more recent case, *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), the Supreme Court again resorted to the clear and present danger concept. In *Landmark*, prosecution was had under a statute which made publication of information about proceedings before a state ju-

dicial review commission a criminal offense under certain conditions. The court found analogy to *Bridges, Pennekamp, Craig* and *Wood* and held the statute invalid unless the prohibited conduct presented, as in contempt cases, a clear and present danger to an effective judiciary.

ty. * * * The bare fact of the communication and its content do not permit the inference that some interference threatened the administration of justice." The second strand of the argument is that such interference as there was must be subjugated to "the rights of persons to freely and even intemperately express their minds." `I disagree with both of those arguments.

## I.

Criminal contempt is primarily designed for the self-protection of the courts and to arm judges with a weapon with which to resist obstructions to justice. Such obstructions may occur in a multitude of ways. One variety is described by Dobbs, *Contempt of Court*, 56 Cornell L.Rev. 183, 190 (1971) as follows: "Another kind of obstruction involves conduct that prejudices the fairness and procedural safeguards of the judicial process; for example, intimidation of judges or jurors. Such conduct is not necessarily a physical disruption of the trial, but neither judge nor jury can decide according to conscience, law, and fact if their decisions can be threatened by the abuse of those who disagree. * * * There are, of course, many ways in which a judicial proceeding might be improperly influenced, and contempt may be used to punish such influences even though they fall far short of intimidation."

As illustrating the foregoing statement, Dobbs cites *City of Macon v. Massey*, 214 Ga. 589, 106 S.E.2d 23 (1958), in which a father called the judge in an effort to discuss the son's case which was pending before the judge. The judge declined to discuss the case and terminated the conversation by hanging up. Thereupon the father went to the judge's office for the purpose of forcing the judge to apologize. The Georgia Supreme Court held that the father had been guilty of two contempts, "first in undertaking to force the judge to discuss his son's cases over the telephone, contrary to the advice and insistence of the judge; and second, in going to the judge's office for the purpose of forcing the judge, by physical force or violence, to apologize." In amplification of that ruling, the court held:

"The time has not yet arrived in Georgia when a person dissatisfied with the results of a judicial proceeding may with impunity require the judge to discuss the matter with him by telephone, in his office, or elsewhere, and thereafter, as a result of the refusal of the judge to discuss the case in a manner satisfactory to the complaining party, challenge the judge to engage in a physical encounter or brawl.

" 'What law confers on a suiter the right to converse about his case with a judge out of court? * * * The office of judge would be intolerable to the holder, and degrading to the state, were the incumbent subjected by law to personal and private approach, questioning and harassment at the will of anxious and discontented suitors * * *. If the judge had to scramble with a mob of suitors or others to reach the bench every morning, and then could punish none of them for the indignity which they had offered the law and public authority, because he had not succeeded in formally opening the court for the day's business before he was insulted, he soon would become powerless to administer justice.' *Baker v. State of Georgia*, 82 Ga. 776, 781–782, 9 S.E. 743, 745, 4 L.R.A. 128. See also *Swafford v. Berrong*, 84 Ga. 65, 10 S.E. 593; *Plunkett v. Hamilton*, 136 Ga. 72, 70 S.E. 781, 35 L.R.A., N.S., 583."

A somewhat similar situation arose in *Freedman v. State*, 176 Md. 511, 6 A.2d 249 (1939). There a prospective character witness wrote a letter to the judge on behalf of the defendant about to be tried in a criminal proceeding. The author of the letter was found guilty of contempt and that finding was affirmed as follows: "It follows from what has been said that although a letter be neither abusive nor threatening, it may, when written to a Judge concerning a case pending before him be contemptuous if designed to influence him in the decision of the case."

The principle of the foregoing cases applies to the present situation. McMilian

called the court for the purpose of talking to Judge Gant before whom his son's probation revocation was pending. On his first call, the bailiff explained that it would be improper for McMilian to do so and that the proper course for him to follow was to talk to his son's lawyer who would in turn do whatever was necessary or appropriate. Not satisfied with that, McMilian persisted with still a second telephone call in which he endeavored once again to break through in order to engage in an ex parte conversation with the judge about the pending case. As held in the cases above cited, that action by McMilian in and of itself constituted contempt.

That, however, was not all. The telephone calls, already acts of contempt, were severely aggravated by McMilian terminating his second conversation with the bailiff with the following lewd obscenity: "Tell Judge Gant that all judges are full of shit, and tell Judge Gant to stick it up his fucking ass." The judge and the court staff personnel are entitled to protection against such vile insults. Subjection to such affront is disruptive to mental state and the court's necessary clerical routine. Equally important, being subjected to such insults and profanities is disruptive to self-respect and the respect to which the court should be held in the eyes of the public. It is for these reasons that numerous cases have held insults to the judge or court personnel constitute acts of contempt.

So in *State v. Sax,* 139 N.J.Super. 157, 353 A.2d 113 (1976) a driver who had been fined by a municipal court remitted the fine to the clerk accompanied by a letter which concluded as follows: "Thank you and fuck you." The writer was held in criminal contempt, and that adjudication was affirmed on appeal.

Similarly, one who wrote to the judge of a municipal court stating that he would not appear on a traffic charge because he would not receive a fair trial and would be the victim of a shakedown was held to be guilty of contempt in *State v. Gussman,* 34 N.J.Super. 408, 112 A.2d 565 (1955).

So also in *In re Jenkinson,* 93 N.J.Eq. 545, 118 A. £40 (1922) a party wrote a letter to a court clerk saying: "I would have knocked your head off your shoulders, if you had been within reach at any time since I received this letter of yours; * * * don't you ever write me in such style again, until you are more sure of your facts." This communication was held to be a direct criminal contempt.

In the case *In re R. W. Woolley,* 74 Ky. (11 Bush) 95 (1875) it was held to be contempt for a lawyer to file a motion for rehearing containing offensive language directed toward the members of the court. The Kentucky Court in passing referred to the judiciary having "the power to preserve its independence and equality by protecting itself against insults and indignities. The right of self-preservation is an inherent right in the courts."

And in *Saunders v. State,* 319 So.2d 118 (Fla.Dist.Ct.App.1975), a witness was found in contempt for refusing to testify. In the course of the colloquy between the judge and the witness out of the presence of the jury, the witness responded to the question of whether he intended to answer by saying, "Hell no. * * * I'm not answering a damn one of the questions." After the trial court declared the witness to be in contempt and as the witness was leaving the courtroom, he called the judge a "Son-of-a-bitch." The Florida Court of Appeals held that the witness was within his constitutional rights in refusing to answer interrogation, but that he was guilty of contempt by his use of profanity addressed to the court.

Somewhat similar is this case of *In re Little,* 404 U.S. 554, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972). In that case the defendant in a criminal case found himself under the necessity to handle his own defense and argue his case at the close of the evidence. In his summation the defendant stated that the court was biased and prejudiced and that the defendant was a political prisoner. The trial judge adjudged the defendant in contempt for those statements. After the contempt adjudication and as the defendant

was being removed from the courtroom, he spoke out and called the judge "a mother fucker." The Supreme Court held that the statements made in the summation could not be held to be contempt. With respect to the epitaph addressed to the trial judge as the prisoner was being led away, the Supreme Court majority opinion states: "This language in a courtroom is, of course, reprehensible and cannot be tolerated. But this was not relied upon by either the District Court or the Superior Court for the conviction and sentence and the State defends the conviction in this Court without any reference to it. We therefore also lay it aside for the purpose of our decision." However, Chief Justice Burger and Justice Rehnquist in a concurring opinion made it clear that they considered the profanity to be contemptuous and the concurring opinion states that "The North Carolina court is, of course, free to promptly summon this petitioner before it and * * * issue process requiring him to show cause why he should not be held in contempt for the conduct and utterances following the contempt adjudication."

See also *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925).

### II.

The majority opinion lays its heaviest emphasis upon the principle of freedom of speech and the "clear and present danger" concept which has been developed in connection therewith. All of the cases cited by the majority opinion have to do with that concept and deal with the problem of the extent to which free speech can be curtailed in the interest of protecting orderly judicial administration. In each of those cases cited by the majority, the alleged contemner had made a real and substantial effort to discuss some issue of public concern. It was that discussion of ideas with which the court in each case was concerned. So, for example, in *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) the opinion states that certiorari had been granted to consider the scope of constitutional protection which should be given to persons when "publication of their thoughts and opinions is alleged to be in conflict with the fair administration of justice...." Similarly in *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) the opinion quoting from *Pennekamp* says: "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." All of these "clear and present danger" cases announce in common a balancing test under which the interest of free speech must be weighed against the interests of unimpeded operation of the court processes. This balancing test is explicitly stated in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978), as follows:

"Properly applied, the [clear and present danger] test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression."

In the present case, unlike the alleged contemners in the cases cited by the majority opinion, McMilian made no effort to discuss any issue of general public interest. Indeed, his utterance was not an attempted exercise of free speech at all—rather it was a naked insult in vulgar, gutter language with no pretence of any intellectual content. In the balancing process said by the United States Supreme Court to be required, there is simply nothing to be put in the scales here on the side of free speech for McMilian.

This very issue was thoroughly considered in *State v. Gussman, supra*, where the contemner relied upon the same United States Supreme Court decisions as the majority does in this case. The New Jersey Court summed up the matter as follows:

"[W]e must inspect the public and individual interests involved in the argument. The *Bridges, Pennekamp* and *Craig* cases were concerned with a very different matter from what we have here. There the court was concerned with comment

by the public press, save that in the *Bridges* case there was also a threat of a strike, made by Bridges through a telegram to the person to whom he had the constitutional right to petition. There quite plainly the court was dealing with the great public interest in leaving truth to 'the competition of the market.' *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (Holmes, J., 1919). As Milton (Areopagitica 51, Hales ed. 1917) put it in his ringing words:

> 'And though all the windes of doctrin were let loose to play upon the earth so Truth be in the field, we do injuriously by licencing and prohibiting to misdoubt her strength. Let her and Falsehood grapple * * *.'

> The rule is that all speech is to be protected, cf. *Adams Theatre Co. v. Keenan*, 12 N.J. 267, 277, 96 A.2d 519 (1953), save as some exception can justify itself. Here we have a public interest in maintaining a sufficient respect for the courts, at any event so that the very defendant served with a ticket may not, in place of an appearance on the return day, turn on the court and flout it to itself—and with gross accusations, insolence and, in a way, defiance. This is not a case that excites society's interest in truth and individual liberties."

See also, *State v. Sax, supra,* which rejects the identical free speech argument.

In my view, McMilian was properly adjudged in contempt of court, and he should be remanded to custody to serve the ten day sentence imposed by the trial court. I respectfully dissent from the majority opinion which holds to the contrary.