In re Carl SMITH, Petitioner,

v.

Sheriff Raymond PACE and the
Honorable Gary Witt,
Respondents.

No. SC 90425.

Supreme Court of Missouri,
En Banc.

May 11, 2010.

Bruce Galloway, Daniel Brogdon, Bruce Galloway LLC, Ozark, for Petitioner.

Timothy Anderson, Jefferson City, Thomas W. Cline, Gainesville, for respondents.

Talmage E. Newton IV, Evans & Dixon LLC, St. Louis, for Missouri Association of Criminal Defense Lawyers.

Anthony E. Rothert, St. Louis, for ACLU of Eastern Missouri.

Stephen D. Bonney, Kansas City, for ACLU of Kansas and Western Missouri.

MICHAEL A. WOLFF, Judge.

### Introduction

The prosecution of a lawyer for criminal contempt of court for words the lawyer wrote in a writ pleading is a difficult and untidy business, as this case shows: The lawyer's duty of zealous advocacy and freedom of speech may clash with the courts' inherent power to protect its proceedings.

At the outset, it should be noted that this habeas corpus proceeding reviews a judgment based on the court's inherent power to punish for criminal contempt, where a jury found the accused attorney, Carl Smith, guilty beyond a reasonable doubt of indirect criminal contempt of court. The result of this proceeding has no bearing on any disciplinary measures that may result from the attorney's conduct.

Smith was prosecuted for criminal contempt of court for strong words he used in petitioning the court of appeals for a writ seeking to quash a subpoena issued for a grand jury in Douglas County. Referring to the prosecuting attorney and the judge overseeing the grand jury, Smith wrote: "Their participating in the convening, overseeing, and handling the [sic] proceedings of this grand jury are, in the least, an appearance of impropriety and, at most, a

conspiracy by these officers of the court to threaten, instill fear and imprison innocent persons to cover-up and chill public awareness of their own apparent misconduct using the power of their positions to do so."

Strong words, indeed. Smith says his words are protected by the First Amendment. The state, on behalf of the respondent judge and sheriff, says they are not.

The jury was instructed to determine—in the curious language of earlier Missouri cases—whether Smith's "statements degraded and made impotent the authority of [the court] and impeded and embarrassed the administration of justice." *See State ex rel. Chassaing v. Mummert*, 887 S.W.2d 573, 578 (Mo. banc 1994). The jury found Smith guilty of criminal contempt. Following the verdict, the court entered an order of commitment for criminal contempt sending Smith to jail for 120 days. Smith petitioned for a writ of habeas corpus, challenging the lawfulness of his conviction and incarceration. This Court issued a writ of habeas corpus and stayed the remainder of Smith's jail commitment pending the outcome of this writ proceeding.

### Facts and Procedural History

Smith, the petitioner in this habeas case, appeared in March 2008 before Judge R. Craig Carter of Douglas County, who had been assigned to oversee the conduct of a Douglas County grand jury that just had been convened. On behalf of one of his clients and Smith's secretary, Smith filed a motion to quash the subpoena and a motion for continuance.[1] Judge Carter overruled Smith's motion to quash but gave him seven days to file a writ in the court of

appeals challenging the judge's decision. Smith then filed such a petition.

On the basis of two paragraphs of Smith's petition filed in the court of appeals, Judge Carter cited Smith for criminal contempt. The two paragraphs of Smith's writ petition said:

1. The attached exhibits reflect the personal interest, bias and purported criminal conduct of Respondent [Judge Carter], Prosecuting Attorney Christopher Wade, and others [sic] members in the judicial system in the Forty–Fourth Judicial Circuit. Their participating in the convening, overseeing, and handling the [sic] proceedings of this grand jury are, in the least, an appearance of impropriety and, at most, a conspiracy by these officers of the court to threaten, instill fear and imprison innocent persons to cover-up and chill public awareness of their own apparent misconduct using the power of their positions to do so.

2. When Relators [Smith's client and Smith's secretary] on March 31, 2008 asked Respondent [Judge Carter] and the prosecuting attorney who were the targets of this grand jury, Relators' assertion that the targets were Relators and their counsel [Smith] was met with tacit admission of silence. This grand jury, as in the last grand jury in Douglas County, is being used by those in power in the judicial system as a covert tool to threaten, intimidate and silence any opposition to their personal control-not the laudable common law and statutory purposes for which the grand jury system was created.

1. Smith contended that production of the documents requested pursuant to the grand jury's subpoena was improper for a variety of reasons. He also suggested that the handwriting on the subpoena was not the prose-

cuting attorney's and that the grand jury had been called in retribution for his client's filing of a motion to disqualify the prosecuting attorney in a pending criminal case.

Smith's "attached exhibits" included affidavits, deposition transcripts, letters and court filings in which Smith and others made allegations against Douglas County prosecuting attorney Christopher Wade and the presiding circuit judge of the 44th Judicial Circuit, claiming that these officials had committed criminal offenses and that the attorney general and members of his staff and other attorneys practicing in the 44th Judicial Circuit had acted unlawfully. The two paragraphs quoted here name only Judge Carter and the prosecutor.

Following receipt of a copy of Smith's court of appeals writ petition in April 2008, Judge Carter issued an order of contempt setting forth the above-referenced paragraphs from Smith's writ petition.[2] Thereafter, Judge Gary Witt, respondent here, was assigned to preside over Smith's jury trial for criminal contempt.

The state presented the two paragraphs cited in Judge Carter's order as well as testimony from Judge Carter in which he testified that the facts in the two paragraphs are false. Judge Carter also testified that he did not believe the two paragraphs were proper "argument" and that a writ petition was an improper avenue for

an attorney who believes a judge has committed, or is committing, wrongdoing.[3] Judge Carter stated the proper avenue was for Smith to file a complaint with the Commission on Retirement, Removal and Discipline. Prior to trial, respondent Judge Witt noted in a docket entry that "[p]laintiff [the state] stipulates that the actions of the defendant [Smith] did not interfere w/grand [sic] jury and that Judge Carter did not rule differently, or fail to take any action with regard to the grand jury based on actions of defendant...." The jury received this portion of the docket entry as evidence.

Although Smith objected to the state's proposed verdict-directing instruction on the grounds that it failed to list the essential elements of criminal contempt, either as a statutory crime or a contempt citation by a judge as at common law,[4] the trial court gave the state's proposed verdict-directing instruction:

> If you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about April 3, 2008, in the County of Douglas, State of Missouri, the defendant served upon R. Craig Carter a Petition for

---

2. Judge Carter's order also said:

> Mr. Smith's Petition continues on to defame the elected Douglas County Prosecuting Attorney, several members of the local bar, and even goes so far as to question actions of the Office of the Chief Disciplinary Counsel's actions [sic]. Additionally, the affidavits and exhibits attached to Mr. Smith's Petition are the most scurrilous, defamatory, venomous attack on the Judicial System the Court has ever witnessed. Indeed, Mr. Smith's writing "tends to degrade or make impotent the authority of the court or to impede or embarrass the administration of justice." *Curtis v. Tozer*, 374 S.W.2d 557, 568 (Mo.App.1964).

However, the state chose not to pursue any action on this part of his order.

3. Despite the interchangeable use in common parlance of the words "attorney" and "lawyer," it is technically precise to use the word "lawyer" to denote a person who is a member of the legal profession (the occupation) and "attorney" as one who represents the interests of a client (the role). *See* definitions in WEBSTER'S NEW THIRD INTERNATIONAL DICTIONARY (1993).

4. See *State ex inf. Crow v. Shepherd*, 177 Mo. 205, 76 S.W. 79 (1903), for a discussion of contempt at common law. *See also State ex rel. Pulitzer Pub. Co. v. Coleman*, 347 Mo. 1238, 152 S.W.2d 640, 646 (1941); *State ex rel. Burrell-El v. Autrey*, 752 S.W.2d 895 (Mo. App.1988); and *Mechanic v. Gruensfelder*, 461 S.W.2d 298 (Mo.App.1970).

Writ of Prohibition against R. Craig Carter, and

Second, that R. Craig Carter was the Judge of the Circuit Court of Douglas County, Associate Circuit Division, Forty-fourth Judicial Circuit, and

Third, that in his Petition for Writ of Prohibition the defendant stated that R. Craig Carter in his position as Judge, used a grand jury to threaten, install fear and imprison innocent persons to cover-up and chill public awareness of apparent misconduct using the power of his position to do so, and

Fourth, that in his Petition for Writ of Prohibition the defendant stated that R. Craig Carter in his position as Judge, handled a grand jury as a tool to threaten, intimidate and silence any opposition to his personal control, and

Fifth, the defendant's statements degraded and made impotent the authority of the Circuit Court of Douglas County, Associate Circuit Division and impeded and embarrassed the administration of justice,

then you will find the defendant guilty of contempt of court.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of contempt of court.

The jury found Smith guilty of criminal contempt based on this instruction. After hearing evidence on sentencing in September 2009, the respondent judge committed Smith to 120 days in jail.[5] Smith then sought a writ of habeas corpus. This Court issued a stay in October 2009 directing Sheriff Raymond Pace, respondent, to release Smith pending review by this Court as provided in Rule 91.

## Standard of Review

There is no right of appeal from a judgment of criminal contempt. *Ex parte Clark*, 208 Mo. 121, 106 S.W. 990, 997 (1907). The only remedy available is to file a writ of habeas corpus. *Id.;* Rule 91.01(b) (A person may seek a writ of habeas corpus when the person is "restrained of liberty within this state [in order] to inquire into the cause of such restraint.").

When this Court issues a writ of habeas corpus, as the Court did in November 2009, the petitioner, Smith, is permitted to brief and argue his grounds for relief so that the court may "inquire into the cause of [petitioner's] restraint," Rule 91.01(b), and determine whether a release from custody is warranted. *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 513 (Mo. banc 2010). The decision whether to grant relief is "limited to determining the facial validity of confinement, which is based on the record of the proceeding that resulted in the confinement." *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 214 (Mo. banc 2001). The habeas court may grant relief by ordering the petitioner discharged from unlawful restraint or deny relief by permitting the petitioner to remain in custody. Rule 91.18; Rule 91.20; *Zinna*, 301 S.W.3d at 513.

Missouri courts have both an inherent power under the constitution to punish for contempt as well as authority to try contempt-of-court cases under the statuto-

---

5. Smith initially was sentenced to confinement in the Douglas County jail, but he immediately was transferred to the Ozark County jail. Sheriff Raymond Pace, respondent, is the sheriff of Ozark County.

ry crime of contempt, section 476.110, RSMo 2000.[6] *Osborne v. Purdome,* 244 S.W.2d 1005, 1012 (Mo. banc 1952).

Missouri's contempt statute, section 476.110, provides for a finding of contempt only where the actions being punished are committed in the court's presence, the actions actually interrupt the court's proceedings or a person disobeys an order of the court. The contempt statute, however, does not limit the power of the courts to punish for contempt as at common law.[7] *Osborne,* 244 S.W.2d at 1012 ("It is settled law that every constitutional court of common-law jurisdiction has the inherent power to punish for contempt, and cannot be shorn of such power by statute.").[8] The courts' inherent power includes "those incidental powers [that] are necessary and proper to [ensure] the performance" of the courts' judicial function under the constitution—"the trying and determining of cases in controversy." *Coleman,* 152 S.W.2d at 646. "The power to punish for contempt should be used sparingly, wisely, temperately and with judicial self-restraint." *In re Estate of Dothage,* 727 S.W.2d 925, 928 (Mo.App.1987).

"[T]here are two classes of contempt—civil and criminal, each class having two subcategories—direct and indirect." *Chassaing,* 887 S.W.2d at 578. Criminal and civil contempt are distinguished by the content of the judgment. *Id.* "Criminal contempt is punitive in nature and acts to protect, preserve, and vindicate the authority and dignity of the judicial system and to deter future defiance." *Id.* Civil contempt is intended to benefit a party for whom relief has been granted by coercing compliance with the relief granted. *Id.* In this case, Judge Carter sought to punish Smith by criminal contempt for the language he had used in his writ petition.

"A direct contempt occurs in the immediate presence of the court or so near as to interrupt its proceedings." *Id.* The judge may punish a direct contempt summarily if the judge saw the conduct constituting contempt. *Id.;* Rule 36.01(a). However, an indirect, or "constructive," contempt "arises from an act outside the court that tends to degrade or make impotent the authority of the court or to impede or embarrass the administration of justice." *Chassaing,* 887 S.W.2d at 578. Acts of indirect contempt require that the

---

6. Section 476.110 provides:
 Every court of record shall have power to punish as for criminal contempt persons guilty of:
 (1) Disorderly, contemptuous or insolent behavior committed during its session, in its immediate view and presence, and directly tending to interrupt its proceeding or to impair the respect due to its authority;
 (2) Any breach of the peace, noise or other disturbance directly tending to interrupt its proceedings;
 (3) Willful disobedience of any process or order lawfully issued or made by it;
 (4) Resistance willfully offered by any person to the lawful order or process of the court;
 (5) The contumacious and unlawful refusal of any person to be sworn as a witness, or, when so sworn, to refuse to answer any legal and proper interrogatory.

7. The respondent judge here argues the contempt was sought under Rule 36.01(b). However, a rule, such as Rule 36.01(b), does not provide the right to seek a cause of action, but merely the procedure to do so. The court's inherent power, not the rule, is the source of the court's power to punish for contempt.

8. Although the legislature has chosen to specify five acts as contemptuous, a court could choose to find these acts contemptuous under its inherent powers as well. The courts' inherent powers are neither expanded nor infringed upon by the statutory contempt power. *See Osborne,* 244 S.W.2d at 1012.

defendant be given notice and a hearing as set out in Rule 36.01(b). *Id.* at 379. In this case, the criminal contempt alleged was indirect.

## Analysis

### Criminal Contempt and "Degrading" Speech

 Despite its origins deep in the common law, the elements of criminal contempt are not well developed. Reported cases of jury trials are hard to find; only in relatively recent years has the United States Supreme Court held that persons cited for contempt where "serious punishment" is sought must be afforded the right of trial by jury. *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).[9] For purposes of determining whether the constitution requires a right to a jury trial, "serious punishment" means incarceration in excess of six months. *Lewis v. United States,* 518 U.S. 322, 325–26, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996). Criminal contempt proceedings with no incarceration or incarceration of fewer than

six months are considered "petty crimes," and no right to jury trial exists. *Id.* In criminal contempt cases where there is no specified maximum punishment,[10] courts may use the penalty actually imposed to determine the character of the offense and whether the right to jury trial existed. *Bloom,* 391 U.S. at 211, 88 S.Ct. 1477. Examining whether there is a right to a jury after the case is tried, however, seems awkward; a trial court needs to know before trial whether a jury is needed.[11] The answer is that if the prosecution seeks a commitment exceeding six months, a jury constitutionally is required—regardless of the penalty actually imposed after trial. *See Right to Jury Trial—Under Particular Circumstances,* 7A Fed. Proc., L. Ed. sec. 17:17 (2010) (citing cases). If a court conducts a contempt hearing without a jury, *Bloom* limits the incarceration time to six months. *Id.*

 The First Amendment has been held to trump restrictions on lawyers' speech. *Gentile v. State,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). This Court does not accept the proposition

---

**9.** This Court has held that at common law there was no right to trial by jury for contempt. *Pulitzer Pub. Co.,* 152 S.W.2d at 645–46. *But cf.* Earl C. Dudley, Jr., *Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempts,* 79 Va. L.Rev. 1025, 1939 n. 14 (1993) ("From the 14th century onward, English common law distinguished between contempts committed in facie curiae and those committed outside the presence of the court. Prior to the 18th century, out-of-court contempts by nonparties to litigation were generally treated as ordinary criminal offenses and tried before juries. Contempts in facie curiae and out-of-court contempts by parties (generally disobedience to court orders) were apparently dealt with by summary procedures, or at least without the intervention of juries. By the late 18th century, all contempts were dealt with by summary procedures at common law.") (internal citations omitted).

These precedents must give way to the United States Supreme Court's 1968 decision in *Bloom,* discussed above in the text, which held that where a serious penalty is imposed, such as more than six months imprisonment, an alleged contemnor is guaranteed the right to trial by jury under the Sixth Amendment. 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522.

**10.** In Missouri, "[p]unishment for contempt may be by fine or imprisonment . . . in the discretion of the court." Section 476.120, RSMo 2000.

**11.** The question here is similar to the question of a court's need to know whether the state seeks incarceration to determine whether the court must appoint counsel for an indigent defendant. *See State ex rel. Missouri Pub. Defender Comm'n v. Pratte,* 298 S.W.3d 870, 887 (Mo. banc 2009).

that First Amendment rights bar punishment of contemptuous speech,[12] but does recognize that the values and limits of the constitutional right must inform the development of the elements of criminal contempt. This is especially true of cases of indirect contempt, which do not take place in the court's presence.

The state, on behalf of the respondents Judge Witt and Sheriff Pace, argues that it is sufficient to sustain Smith's conviction for contempt because a jury found that

12. *See, e.g., Shepherd,* 76 S.W. at 79–80. The Court in *Shepherd* found a newspaper publisher in contempt of court for publishing harsh criticism of this Court, which harkens to the olden days when judges of this Court were elected in partisan elections. The newspaper, published in Warrensburg, said:

> When a citizen of Missouri stops long enough to think of the condition of affairs in his state, it is enough to chill his blood.... [T]he Supreme Court has, at the whipcrack of the Missouri Pacific Railroad, sold its soul to the corporations, and allowed Rube Oglesby to drag his wrecked frame through this life without even the pitiful remuneration of a few paltry dollars. Learned men of the law say that Rube Oglesby had the best damage suit against a corporation ever taken to the Supreme Court. This very tribunal, after reading the evidence and hearing the arguments of the attorneys, rendered a decision sustaining the judgment of the lower court, which decision was concurred in by six of the seven members of the court. This is usually the end of such cases, and the decision of a Supreme Court, once made, usually stands. But not so in the Oglesby case. Three times was this case, at the request of the railway attorneys, opened for rehearing, and three times was the judgment of the lower court sustained. But during this time, which extended over a period of several years, the legal department of this great corporation was not the only department which was busy in circumventing the defeat of the Oglesby case. The political department was very, very busy. Each election has seen the hoisting of a railway attorney to the Supreme Bench, and, when that body was to the satisfaction of the Missouri Pacific, the onslaught to kill the Oglesby case began. A motion for a rehearing was granted, and at the hearing of the case it was reversed on an error in record of the trial court, and was sent back for retrial. That was in the early part of the year 1902. The case was tried in Sedalia before Circuit Judge Longan, one of the ablest jurists in the state, and we have been informed that no error was allowed to creep into the record at the second trial. Again the jury rendered judgment in favor of Oglesby for $15,000, and again the case was appealed to the Supreme Court. An election was coming on, and the railroad needed yet another man to beat the Oglesby case. The Democratic nominating convention was kind, and furnished him, in the person of Fox. The railroad, backed by four judges on the bench, allowed the case to come up for final hearing, and Monday the decision was handed down, reversed and not remanded for retrial. The victory of the railroad has been complete, and the corruption of the Supreme Court has been thorough. It has reversed and stultified itself in this case until no sane man can have any other opinion but that the judges who concurred in the opinion dismissing the Oglesby case have been bought in the interest of the railroad. What hope have the ordinary citizens of Missouri for justice and equitable laws in bodies where such open venality is practiced? And how long will they stand it? The corporations have long owned the Legislature, now they own the Supreme Court, and the citizen who applies to either for justice against the corporation gets nothing. Rube Oglesby and his attorney, Mr. O.L. Houts, have made a strong fight for justice. They have not got it. The quivering limb that Rube left beneath the rotton [sic] freight car on Independence Hill, and his blood that stained the right of way of the soulless corporation, have been buried beneath the wise legal verbiage of a venal court, and the wheels of the Juggernaut will continue to grind out men's lives, and a crooked court will continue to refuse them and their relatives damages, until the time comes when Missourians, irrespective of politics, rise up in their might and slay at the ballot box the corporation-bought lawmakers of the state.

*Id.* The Court's ability to punish by contempt for such language in the current era would be constrained by the First Amendment.

Smith's "statements degraded and made impotent the authority of the Circuit Court of Douglas County, Associate Circuit Division and impeded and embarrassed the administration of justice." Smith argues that his statements are protected by the First Amendment to the United States Constitution and, therefore, a judgment of contempt for these statements is improper. The parties cite no Missouri reported case, nor can the Court find one, where a contempt-of-court charge was tried to a jury. In fairness to the parties, the law of indirect contempt as applied to lawyers is confusing and unclear both in this state and throughout the nation.[13]

### Criticism by non-lawyers

■ Comments regarding pending court cases—when made by non-lawyers—are protected by the First Amendment. In *Bridges v. California*, the United States Supreme Court established that the First Amendment requires there to be "a clear and present danger" of a substantive evil before newspaper publishers can be charged with contempt for publishing criticism of a judge regarding a pending case. 314 U.S. 252, 263, 62 S.Ct. 190, 86 L.Ed. 192 (1941). Moreover, the evil itself must be "extremely serious" and the imminence of danger "extremely high before utter-

ances can be punished." *Id.* In holding the publishers could not be charged with contempt, the Supreme Court said it was not enough for the published statements to have either an "inherent tendency" or a "reasonable tendency" to affect the administration of justice. *Id.* at 273.

Following *Bridges*, the Supreme Court examined what protection should be given to comments in a newspaper that directly criticized a specific judge. *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947). The Supreme Court first noted its earlier holding that although " '[c]ourts must have power to protect the interests of . . . litigants before them from unseemly efforts to pervert judicial action. In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases.' " *Id.* at 373, 67 S.Ct. 1249 (quoting *Pennekamp v. Florida*, 328 U.S. 331, 347, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946)). The Supreme Court then examined the specific language the newspaper had used to criticize the judge.[14] *See Harney*, 331 U.S. at 375–76, 67 S.Ct. 1249. The Supreme Court stated that the editorial contained "strong language, intemper-

---

13. *See, e.g.,* Louis S. Raveson, *Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power, Part One: The Conflict Between Advocacy and Contempt,* 65 WASH L.REV. 477, 482 (1990) ("Presently, the standards governing both the limits of acceptable advocacy and the scope of the contempt power are haphazard and imprecise."); Dudley, *Getting Beyond the Civil/Criminal Distinction,* at 1025 ("The literature on contempt of court is unanimous on one point: the law is a mess.").

14. According to the Court, the offensive language in the editorial was as follows:
It called the judge's refusal to hear both sides "high handed," a "travesty of justice," and the reason that public opinion was

"outraged." It said that his ruling properly "brought down the wrath of public opinion upon his head" since a service man "seems to be getting a raw deal." The fact that there was no appeal from his decision to a "judge who is familiar with proper procedure and able to interpret and weigh motions and arguments by opposing counsel and to make his decisions accordingly" was a "tragedy." It deplored the fact that the judge was a "layman" and not a "competent attorney." It concluded that the "first rule of justice" was to give both sides an opportunity to be heard and when that rule was "repudiated," there was "no way of knowing whether justice was done."
*Harney,* 331 U.S. at 375–76, 67 S.Ct. 1249.

ate language, and [was], we assume, an unfair criticism." *Id.* at 376, 67 S.Ct. 1249. Nevertheless, the Court reasoned that:

> a judge may not hold in contempt one "who ventures to publish anything that tends to make him unpopular or to belittle him . . . ." The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil.

*Id.* at 376, 67 S.Ct. 1249 (quoting *Craig v. Hecht,* 263 U.S. 255, 281, 44 S.Ct. 103, 68 L.Ed. 293 (1923) (Holmes, J., dissenting)) (omission in original). The Supreme Court held that although the editorial's language may lower the judge's standing in the eyes of the public, it did not "create an imminent and serious threat to the ability of the court to give fair consideration to the motion for rehearing" at issue. *Harney,* 331 U.S. at 377–78, 67 S.Ct. 1249.

The Missouri appeals court applied the Supreme Court's standard in *McMilian v. Rennau,* in which McMilian was charged with indirect criminal contempt for his statements about a judge regarding a pending case. 619 S.W.2d 848, 850 (Mo. App.1981). McMilian had telephoned the court and asked to speak to Judge Gant about criminal charges that were pending involving McMilian's son. *Id.* When the bailiff informed him that the judge would not engage in *ex parte* discussions regarding a pending case, McMilian told the bailiff: " 'Tell Judge Gant that all judges are full of sh*t and tell Judge Gant to stick it up his f**king *ss.' " *Id.* The court echoed the Supreme Court's decisions and held that a contempt conviction requires "a demonstrated impediment to the judicial process, real, threatened and imminent." *Id.* at 853. The court noted that although

McMilian's remarks were "offensive and boorish, [they] were far less egregious than the widely published statements in *Bridges, Pennekamp* and other cited cases." *Id.*

These cases make it clear that statements about pending cases by non-lawyers are protected by the First Amendment under a "clear and present danger" standard.

**Criticism by lawyers**

With respect to lawyers, however, it is not nearly as clear what protection the First Amendment provides. The United States Supreme Court held that states may use a lesser standard than that applied to non-lawyers to decide if a lawyer should be *disciplined* for his or her speech. *Gentile,* 501 U.S. 1030, 111 S.Ct. 2720. *Gentile,* a Nevada attorney, held a news conference upon the indictment of one of his clients and allegedly violated a Nevada Supreme Court rule prohibiting attorneys from making extrajudicial statements that had a "substantial likelihood of materially prejudicing an adjudicative proceeding." *Id.* at 1033, 111 S.Ct. 2720. Although the Supreme Court struck down the Nevada rule on other grounds, the Court endorsed Nevada's "substantial likelihood" standard as sufficient under the First Amendment for the discipline of attorneys who had made extrajudicial statements concerning pending cases. *Id.* at 1048–49, 1072, 111 S.Ct. 2720.

Since *Gentile,* numerous state courts have considered the regulation of lawyer speech. Almost all of these cases, however, have involved situations in which a lawyer is disciplined under his or her state's ethics rules. *See, e.g., In re Comfort,* 284 Kan. 183, 159 P.3d 1011 (2007) (citing cases). In *In re Westfall,* decided shortly before *Gentile,* this Court held that a lawyer who made a derogatory statement about a judge could be disciplined if

he made the statement "with knowledge of its falsity or in reckless disregard" for the truth. 808 S.W.2d 829, 837 (Mo. banc 1991). The Court reasoned that lawyers who were subjected to discipline for their speech could be held to a higher standard than those who were subject to "civil or criminal sanctions" because lawyers were admitted to the bar "to protect the public and the administration of justice." *Id.* This Court distinguished *Garrison v. Louisiana*, which held that a district attorney who had been charged with defamation for disparaging the judicial conduct of eight judges could "be the subject of either civil or criminal sanctions" only if the statements were made "with [a] high degree of awareness of their probable falsity." 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The scrutiny of a state's interest in regulating lawyer speech may be significantly higher today than when this Court decided *Westfall*.[15] *See, e.g., Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

In any event, cases involving lawyers' statements require some knowledge of falsity or, at the very least, a reckless disregard for whether the false statement was true or false. The disciplinary process may be a more suitable forum than a contempt proceeding for ascertaining a lawyer's knowledge as to the truth or falsity of the lawyer's statements.[16] Monetary sanctions pursuant to Rule 55.03(c) rather than incarceration also may be more suitable.[17]

### The Truth May Set Him Free; Falsehoods May Get Him Jail

 There can be no doubt that the First Amendment protects truthful statements made in judicial proceedings. It is essential, therefore, to prove that the lawyer's statements were false and that he either knew the statements were false or that he acted with reckless disregard of whether these statements were true or false. In this case, there was no mental state (*mens rea*) requirement in the jury instruction.[18] The instruction did not require the jury to find that Smith knew his statements were false or that Smith showed reckless disregard for the truth. The only contested issue the instruction asked the jury to find was whether Smith's written statements to the court of appeals "degraded and made impotent the authority of the Circuit Court of Douglas County,

15. Geoffrey C. Hazard, Jr. & W. William Hodes commented about the contrast between *Westfall* and the United States Supreme Court decision *In re Snyder*, 472 U.S. 634, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985): "[T]he case of *In re Westfall* ... is troubling indeed.... [T]he *Westfall* court did not conscientiously assess the reasonableness *of the lawyer's state of mind in making his statements,* but appeared to be judging the reasonableness of what was said. Moreover, the court's findings as to the 'falseness' of what was said were themselves highly questionable." THE LAW OF LAWYERING 63–14, 63–18 (3d. ed. Supp. 2009) (emphasis in original).

16. See *In re Snyder*, 472 U.S. at 646–47, 105 S.Ct. 2874, in which the United States Supreme Court held that a lawyer's letter criticizing the Eighth Circuit court of appeals' administration of the Criminal Justice Act was not sufficient to suspend the lawyer from the practice of law, because his concerns had "merit" and "a single incident of rudeness or lack of professional courtesy-in this context-does not support a finding of contemptuous or contumacious conduct...."

17. Rule 55.03(c) applies to civil proceedings. The alleged contemptuous statements in this case were made in writ proceedings, which are civil proceedings.

18. "A crime generally consists of two elements: the physical, wrongful deed (the *actus reus*) and the guilty mind that produces the act (the *mens rea*)." *State v. Roberts*, 948 S.W.2d 577, 587 (Mo. banc 1997).

Associate Circuit Division and impeded and embarrassed the administration of justice." Although this language is present in the scant case law available—as a sole basis for a finding of criminal contempt and the resulting order of commitment to incarceration—it does not comport with the constitutional protections of free speech in United States Supreme Court precedents.

Under this instruction, the assistant attorney general prosecuting the case was able to argue, in effect, that it did not matter whether Smith's statements about Judge Carter were true or false or whether Smith thought they were true or false. The attorney told the jury that if Smith thought Judge Carter was a crook, the "legal thing" to do is to file a complaint with the disciplinary authorities. " . . . [Y]ou can't call the judge a crook. I ask you to read these instructions carefully and ask you to find Carl Smith guilty for contempt of court."

 Even in disciplinary cases, this Court and the United States Supreme Court have recognized that lawyers have First Amendment rights. A lawyer's duty to the client requires that the lawyer represent the client zealously within the bounds of the law. Rule 4, Preamble: A Lawyer's Responsibilities; *Sprung v. Neg-*

*wer Materials, Inc.,* 727 S.W.2d 883, 893 (Mo. banc 1987) (Rendlen, J., concurring).[19] Before a lawyer can be found guilty of criminal contempt for what is written in his or her pleadings, there must be some finding that the lawyer's statements were made with actual knowledge of their falsity or that the statements were in fact false and were made with reckless disregard of whether they were true or false.

The only witness in this case was Judge Carter, the complainant. He testified that Smith's written statements were false. But the jury was not asked to find that Smith's statements were false, that Smith knew they were false or that he made the statements with reckless disregard of whether they were true or false. There simply was no evidence from which the jurors could find the requisite state of Smith's mind regarding the falsity of the statements, nor were they asked to do so.[20]

## Statements That Degrade and Make Impotent the Court's Authority?

 With due respect to this Court's earlier description of contempt as "statements [that] degraded and made impotent the authority of the [the court] and impeded and embarrassed the administration of justice," words that degrade or make im-

---

19. The bounds of the law do not permit the lawyer to make false statements with reckless disregard for their falsity, nor do the bounds of law permit a lawyer to make statements the lawyer knows to be false. Rule 4-8.2(a).

20. *See Holt v. Virginia,* 381 U.S. 131, 85 S.Ct. 1375, 14 L.Ed.2d 290 (1965). In *Holt,* attorneys were charged with contempt for the language used alleging bias in motions to change venue and for disqualification of the judge. *Id.* at 134–35. The Supreme Court said:

[the state's] apparent contention [is] that the contempt convictions should be sustained on the ground that petitioners' charges of bias were false. The truth or falsity of these charges was not heard, the

trial court choosing instead to convict and sentence petitioners for having done nothing more than making the charges. Even if failure to prove their allegations of bias could under any circumstances ever be made part of the basis of a contempt charge against petitioners, these convictions cannot rest on any such unproven assumption.

Our conclusion is that these petitioners have been punished by [the state] for doing nothing more than exercising the constitutional right of an accused and his counsel in contempt cases such as this to defend against the charges made.

*Id.* at 137–38, 85 S.Ct. 1375.

potent or impede or embarrass, by themselves, are not enough to support a finding of criminal contempt under United States Supreme Court precedents. In a case involving direct contempt, the United States Supreme Court said: "[w]hile we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom, or even from conduct so near to the court as actually to obstruct justice, it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases." *In re McConnell,* 370 U.S. 230, 236, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962).

 The First Amendment requires that the threat to the court's authority must be real; the lawyer's statements and attendant conduct actually must have interfered with or posed an imminent threat of interfering with the administration of justice. *See, e.g., In re Jefferson,* 283 Ga. 216, 657 S.E.2d 830, 833 (2008). While this is the standard in cases of direct contempt—that is, in incidents occurring in the court's presence or vicinity—there is no logical reason to have a more relaxed standard for contempt of court for written pleadings.

In this case, the state stipulated that the defendant's actions did not interfere with the grand jury and "that Judge Carter did not rule differently, or fail to take any action with regard to the grand jury based on actions of defendant. . . ." If that is true, as the state agrees, was the threat to the court's authority real? There is no evidence that Smith's written statements interfered with or posed an imminent threat of interfering with the administration of justice.

### Conclusion

 In a prosecution for indirect criminal contempt of court, initiated by a judge who cites a lawyer for contempt for the lawyer's statements, the essential elements are:

(1) The lawyer's statements were false;

(2) The lawyer knew the statements were false or acted with reckless disregard for whether the statements were true or false;

(3) The effect of the statements constituted an actual or imminent impediment or threat to the administration of justice.

Limiting cases of indirect criminal contempt to those where these elements are proved will satisfy constitutional protections for lawyer speech and will help to ensure that the courts of this state will use contempt powers "sparingly, wisely, temperately and with judicial self-restraint." *In re Estate of Dothage,* 727 S.W.2d at 928.

In addition to the deficient jury instruction and the lack of evidence as to the essential elements of indirect criminal contempt, the trial court's judgment fails to recite any findings of fact as to the three essential elements listed above. In contempt proceedings "the facts and circumstances constituting the offense, not mere legal conclusions, must be recited in both the judgment of contempt and the order of commitment." *Ex parte Brown,* 530 S.W.2d 228, 230 (Mo. banc 1975); *see* section 476.140, RSMo 2000. Neither the judgment of contempt nor the order of commitment contained the necessary factual findings.

Smith is ordered discharged.

All concur.